No. 77–1464. HUCH ET AL. v. UNITED STATES;

No. 77–1467. SOUTH PARK INDEPENDENT SCHOOL DIS-TRICT v. UNITED STATES; and

No. 78–222. BOARD OF EDUCATION FOR THE CITY OF VAL-DOSTA, GEORGIA v. UNITED STATES. C. A. 5th Cir. Certiorari denied. Reported below: Nos. 77–1464 and 77–1467, 566 F. 2d 1221; No. 78–222, 576 F. 2d 37.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE POWELL joins, dissenting.

Efforts to describe the complex of factors that go into a decision by this Court to deny certiorari in any given case date back at least to the opinion of Mr. Justice Frankfurter in *Maryland* v. *Baltimore Radio Show,* 338 U. S. 912 (1950), and I shall make no attempt to embroider them here. Some Members of the Court may feel that a case is wrongly de-cided, but lacking in general importance; others may feel that it is of general importance, but rightly decided; for either reason, a vote to deny certiorari is logically dictated. In these cases it seems to me demonstrable that the Court of Appeals has not properly assessed the relationship between *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971), and *Pasadena City Board of Education* v. *Spangler,* 427 U. S. 424 (1976). Obviously we cannot review in this Court every school desegregation case decided by a Court of Appeals, and particularly where, as here, the Court of Ap-peals merely remands the case to the District Court for further proceedings, there is a very natural tendency to con-clude that the decisions of the Court of Appeals are not deserving of plenary review given the almost unmanageable caseload of the Court. But the Court of Appeals from which these cases come historically has had to decide more school desegregation cases than any other Court of Appeals, and the interminable pendency of school desegregation litigation re-sulting from remand orders such as these is precisely what was condemned in *Pasadena, supra.* I would therefore grant

certiorari to review the orders of the Court of Appeals remanding these cases to their respective District Courts.

I

*Nos. 77–1464 and 77–1467. South Park Independent School District*

The United States brought this action in 1970, and in that same year the District Court adopted a school desegregation plan submitted by the district, "with certain modifications designed to increase the overall percentage of integration at particular schools." App. to Pet. for Cert. in No. 77–1467, pp. C–1—C–2 (hereinafter cited as Pet.). Since no party sought to appeal, the District Court's order became final. Almost six years later, the United States filed a motion for "supplemental relief," seeking an order requiring the district to "develop, adopt and implement a comprehensive school desegregation plan." The Government's motion, it should be noted, was filed *after* this Court's decision in *Pasadena, supra.* The motion was supported largely by the Government's assertion that during the 1975–1976 school term, 75.1% of all black students in the system attended schools that were 92% or more black, while 77.5% of all white students attended schools that were 86% or more white. The School District filed a reply, a group of parents succcessfully sought to intervene, and two separate hearings on the Government's motion were held in the District Court. The School District called witnesses in support of its petition; the Government called none.

The court concluded from the evidence before it that the 1970 desegregation order had dissolved all vestiges of a dual system. Noting that in each academic year since entry of the 1970 order total student enrollment in the district had consistently declined, while the percentage of black students enrolled in the district had steadily increased, the District Court found that "[t]he desegregative results differing from those anticipated in 1970 have been the result of shifting residential

patterns, attendance of some district students at private schools, and other factors beyond the control of defendant [school district] . . . ." Pet. B–5. The court also found that the School District had complied with the 1970 order in all respects and had taken no action having a natural and foreseeable segregative effect on schools in the district. Student class assignments in the district had been made without regard to race or color, and no state agency had attempted to alter the residential or demographic patterns affecting the comprehensive neighborhood attendance plan set forth in the 1970 order. Concluding that no further action on its part was constitutionally required, the District Court denied the motion for supplemental relief.[1]

The Court of Appeals believed that this case was governed by a single passage from *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S., at 26, removed from its context, describing the duty of district courts to scrutinize initial desegregation plans proposed by school boards for systems with a history of segregation where such plans contemplate the continuance of some schools that "are all or predominantly of one race." [2] I think that the Court of Appeals erred in applying this particular passage from *Swann* to a

---

[1] The District Court also based its denial of the motion for supplemental relief on the Government's failure to comply with 20 U. S. C. § 1758, which in essence requires that local school authorities be given notice and a reasonable opportunity to develop a voluntary remedial plan before any existing court-approved desegregation plan may be modified.

[2] " 'Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.' " *United States* v. *South Park Independent School Dist.,* 566 F. 2d 1221, 1225 (CA5 1978), quoting *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S., at 26.

school desegregation plan which had been accepted by all parties at the time of its inception, and had been in effect for six years before the Government decided to seek supplemental relief.[3] In *Swann* itself this Court acknowledged the reality that minority groups are often found concentrated in particular parts of metropolitan areas. Recognizing that demographic patterns can be affected by natural human migration as well as by official discrimination, the *Swann* court observed:

"Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. . . . [I]n the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary." *Id.*, at 31–32.

This language was brought into sharper focus in *Pasadena City Board of Education* v. *Spangler,* 427 U. S. 424 (1976). Petitioner in *Pasadena* sought in 1974 to be relieved of a provision of a 1970 desegregation order requiring that there be no majority of any minority at any Pasadena school. Although the 1970 order had established a racially neutral system of student assignment in Pasadena, a "normal pattern of human migration" over the following four years had caused some Pasadena schools to "sli[p] out of compliance" with the no-majority-of-any-minority requirement. The District Court

[3] Indeed, the District Court noted. that "[t]he Department of Health, Education and Welfare, an agency of [the Government] charged with such responsibility, has approved student integration procedures in defendant district in each academic school year from entry of the Court's order to the present, and prospectively, for academic school year 1977–78." Pet. B–5.

denied relief, apparently believing it had authority to impose the requirement upon Pasadena schools regardless of what had caused the post-1971 change in their racial composition. We held that the District Court lacked such authority:

"[T]he District Court was not entitled to require [Pasadena] to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity. For having once implemented a racially neutral attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." *Id.,* at 436–437.

The thrust of *Swann* and *Pasadena,* when taken together, is that a district court must heed the *Swann* mandate to closely scrutinize predominantly one-race schools when approving an *initial* desegregation plan in a school district with a history of *de jure* segregation, but that the District Court has no obligation, indeed, has no authority, to monitor the plan indefinitely to make sure that the initial *Swann* requirements are maintained year after year in spite of demographic changes which are in no way attributable to the school board. A unanimous Court in *Swann* made clear that the Constitution requires the dismantling of dual school systems, but does not mandate racial balance in schools. This principle was reaffirmed in *Milliken* v. *Bradley,* 418 U. S. 717, 740–741 (1974).

Here the Court of Appeals acknowledged that the District Court had found "no basis for relief since the 1970 plan had desegregated the school district thereby dissolving all vestiges of a dual school system." *United States* v. *South Park Independent School Dist.,* 566 F. 2d 1221, 1224 (CA5 1978). After expressly observing that it did not view the case as "a situation where a district court has refused to rule," the

Court of Appeals nonetheless found the District Court's holding that the School District was unitary "not detailed enough to show us whether or not the school system meets [the] *Swann* requirement." *Id.*, at 1225. Accordingly, the case was remanded to the District Court for "supplemental findings of fact."

I believe the Court of Appeals was wrong in its analysis of Fourteenth Amendment law when it implied that *Swann* rather than *Pasadena* would apply to a situation in which there *had been in effect* for six years a school desegregation plan fully accepted by all of the parties, including the United States. But more importantly, this case has an unsettling precedential potential for similar cases throughout the federal-court system. The Court of Appeals' opinion gives no clue to the District Court as to where it went wrong or how it can correct whatever mistake the Court of Appeals believes that it made. So far as I can tell from the remand order of the Court of Appeals, the District Court appears condemned to a fate akin to that of Sisyphus, the mythical King of Corinth who was sentenced by Zeus to an eternity in Hades trying "to roll a rock uphill which forever rolled back upon him." [4] Such a result, in my view, represents a departure "from the accepted and usual course of judicial proceedings" sufficient to warrant a grant of certiorari pursuant to our Rule 19 (1)(b).

## II

*No. 78–222. Board of Education for the City of Valdosta v. United States*

In *Board of Education for the City of Valdosta* v. *United States,* 576 F. 2d 37 (CA5 1978), another panel of the Fifth Circuit relied upon the decision in *South Park* as "the law of school desegregation *as currently understood in this Circuit.*" 576 F. 2d, at 38 (emphasis added). There the United States

---

[4] E. Hamilton, Mythology 439–440 (1945).

moved in 1976 for supplemental relief to "correct" the racial imbalance that had developed in certain Valdosta elementary schools since entry of the District Court's desegregation plan in 1971. After an evidentiary hearing, the District Court found that the school board had followed the 1971 desegregation order to the letter and that any racial imbalance in Valdosta schools "exists . . . not because of any action or inaction on the part of the Defendant Board of Education, but . . . simply because of a change in housing patterns which has occurred since the date of the Court's original order . . . ." App. to Pet. for Cert. in No. 78–222, p. 5c. Having found the Valdosta school system unitary, the District Court denied the Government's motion for supplemental relief.

On appeal the Court of Appeals rejected the contention that the District Court's holding was compelled by *Pasadena City Board of Education* v. *Spangler*. Relying on *South Park* for the propositon that "the continued existence of a significant number of virtually one-race schools is constitutionally suspect," the court held that the "high incidence of racially identifiable schools belies the school board's contention that Valdosta has achieved a unitary school system. 576 F. 2d, at 38. Accordingly, the case was "remanded to the district court for the development of a plan . . . designed to alleviate the incidence of virtually one-race elementary schools." *Ibid.*

The Court of Appeals, having based its decision solely on statistics indicating that there were five racially identifiable elementary schools in Valdosta in 1976, undoubtedly acknowledged but can hardly be said to have heeded this Court's observation in *Swann*, 402 U. S., at 26, that "the existence of some small number of one-race . . . schools within a district is not in and of itself the mark of a system that still practices segregation by law." Before a district court can move under the Constitution to "correct" racially imbalanced schools, it must be shown that the imbalance was in some

manner "caused by segregative actions chargeable to [school authorities]." *Pasadena City Board of Education* v. *Spangler,* 427 U. S., at 435. There is no indication in the Court of Appeals' opinion that the Government carried its burden of proving that the racial mix of Valdosta's elementary schools was the product of official discrimination, either present or past. Absent such a showing in the record, the District Court's finding that Valdosta had achieved a unitary school system cannot be held to be clearly erroneous. See *Dayton Board of Education* v. *Brinkman,* 433 U. S. 406, 417–418 (1977). Accordingly, I dissent from the Court's denial of certiorari in this case.