Anthony T. LEE et al., Plaintiffs,

United States of America,
Plaintiff-Intervenor-Appellant,

v.

MACON COUNTY BOARD OF EDUCA-
TION et al., Defendants-Appellees.

No. 79–2499.

United States Court of Appeals,
Fifth Circuit.

May 7, 1980.

J. R. Brooks, U. S. Atty., Birmingham, Ala., James P. Turner, Deputy Asst. Atty. Gen., Michael B. Wise, John C. Hoyle, General Litigation Section, Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-intervenor-appellant.

Phelps, Owens & Jenkins, Sam M. Phelps, J. Russell Gibson, III, Tuscaloosa, Ala., for defendants-appellees.

Before GEE, FAY and VANCE, Circuit Judges.

FAY, Circuit Judge:

Among the individual school districts added as defendants during the tortuous course of this statewide school desegregation case was the Tuscaloosa City School System, joined in 1969. In *Lee v. Macon County Board of Education*, 429 F.2d 1218 (5th Cir. 1970) (Tuscaloosa I), this court affirmed the initial district court order approving a plan to desegregate Tuscaloosa's schools with neighborhood geographic attendance zones. After the United States Supreme Court decision in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) and this court's decision in *Ellis v. Board of Public Instruction of Orange County, Florida*, 465 F.2d 878 (5th Cir. 1972), *cert. denied*, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973) (Ellis II), the United States, as plaintiff-intervenor, filed a motion for supplemental relief, seeking a new plan of student assignment for more effective desegregation. The district court denied relief. In *Lee v. Tuscaloosa City School System*, 576 F.2d 39 (5th Cir. 1978) (Tuscaloosa II), this court, in light of *Swann* and *Ellis II*, vacated the district court's order and remanded with instructions to the district judge to fashion a remedy "designed to alleviate the condition of racially identifiable schools in Tusca-loosa." *Id.* at 41. After submission of various plans by the parties, the district court devised a school desegregation plan and ordered its implementation. Bringing the Tuscaloosa case before this court for the third time, the United States now appeals the district court's latest order. The government argues that inadequate desegregation of Tuscaloosa's elementary grades under the latest plan renders the system as a whole unconstitutional. We recognize that the district judge confronted myriad problems in his attempt to weave a workable desegregation plan, and we commend the school board for their genuine desire to achieve school desegregation. The plan they devised makes giant strides toward a unitary system. It simply does not go far enough. Accordingly, the district court's order is vacated and the case remanded with instructions to modify the desegregation plan to achieve a unitary school system in Tuscaloosa.

After this court's remand in *Tuscaloosa II*, the district court ordered the defendant school system to submit plans for desegregating Tuscaloosa's senior high schools in 1978–79 and for desegregating the junior high and elementary schools thereafter. The district court reviewed the plans submitted, delayed their implementation, and ordered the school system to submit by January 1, 1979, additional plans for complete desegregation of the entire city school system. The defendant school system complied, submitting new, alternate desegregation plans. In response, the United States submitted other alternative plans. After a hearing held in April, 1979, the district judge issued an order adopting a modified version of the school system's plan. The United States now challenges that part of the plan dealing with desegregation of the elementary grades. All parties agree that except as to grades kindergarten through five the district court has fully complied with the dictates of the United States Supreme Court and our mandate in *Tuscaloosa II*.

Under the district court's order, Tuscaloosa was to achieve complete desegregation of

its senior high schools in 1979–80 by sending all ninth and tenth grade students to the formerly all-black Druid High School and all eleventh and twelfth grade students to the formerly all-white Tuscaloosa High School. Under a second part of the plan, grade six would join former junior high grades seven and eight in 1980–81 to form middle schools. Then, a school pairing plan similar to that for the senior high schools would effect desegregation in the middle schools. Under the district court's order, however, elementary grades kindergarten through five would be subject to the same neighborhood geographic attendance zones that were in effect under the 1970 plan, the plan which as a whole was rejected in *Tuscaloosa II.* Continuing that plan of student assignment, Tuscaloosa would maintain four elementary schools which in 1978–79 had had student populations more than 97% black and one elementary school which had had a student population of 99% white. Additionally, other elementary schools which had been "racially identifiable" would remain so.[1] The parties agreed that virtually no further desegregation in these lower grades would ever be achieved by continuing the 1970 student assignment plan. Consequently, two-thirds of Tuscaloosa's elementary grade black students

would continue to attend schools more than 95% black.[2]

Notwithstanding this degree of racial disparity, the district court approved the plan for the elementary grades, giving five reasons in the memorandum opinion filed with his order. By assimilating and articulating this five-fold rationale for the elementary school plan, the district judge amply fulfilled his duty to consider local conditions in preparing a desegregation plan. *See Wright v. Council of City of Emporia,* 407 U.S. 451, 466, 92 S.Ct. 2196, 2205, 33 L.Ed.2d 51 (1972). His overriding responsibility, however, was "to eliminate from the public schools all vestiges of state-imposed segregation." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 14, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). *See also Lee v. Tuscaloosa City School System,* 576 F.2d at 41. Insofar as the practicalities of the situation allowed, the court was to make every effort to achieve the greatest possible degree of desegregation. *See Davis v. Board of School Commissioners of Mobile County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). The court's decision, however, does not detail sufficient factual findings for us to ascertain whether the plan reached the maximum desegregation permitted by local

1. Racial composition of Tuscaloosa's elementary schools in 1978–79:

| Elementary Schools | W | B | % B |
|---|---|---|---|
| Alberta | 237 | 69 | 23% |
| Arcadia | 336 | 43 | 11% |
| Central | 16 | 550 | 97% |
| East End | 79 | 116 | 59% |
| Northington | 567 | 104 | 15% |
| Oakdale | 116 | 114 | 50% |
| Parkview | 61 | 197 | 76% |
| Skyland | 437 | 112 | 20% |
| Stafford | 69 | 119 | 63% |
| Stillman Heights | 0 | 498 | 100% |
| 32nd Ave. | 1 | 713 | 99.9% |
| 20th St. | 1 | 512 | 99.8% |
| Univ. Place | 325 | 41 | 11% |
| Verner | 336 | 116 | 26% |
| Woodland Forrest | 327 | 4 | 1% |

Defendant's Exhibit 4.

2. Projected Enrollments under Elementary School Desegregation Plan Adopted by District Court:

| Elementary Schools | 1980–81 (Grades K–5) | | |
|---|---|---|---|
| | W | B | % B |
| Alberta | 215 | 70 | 25% |
| Arcadia | 249 | 42 | 14% |
| Central | 22 | 524 | 96% |
| East End | 84 | 104 | 55% |
| Northington | 344 | 130 | 27% |
| Oakdale | 95 | 98 | 51% |
| Parkview | 72 | 207 | 74% |
| Skyland | 423 | 126 | 23% |
| Stafford | 76 | 116 | 60% |
| Stillman Heights | 0 | 485 | 100% |
| 32nd Ave. | 1 | 666 | 99.8% |
| 20th St. | 0 | 502 | 100% |
| Univ. Place | 321 | 41 | 11% |
| Verner | 300 | 136 | 31% |
| Woodland Forrest | 323 | 6 | 2% |

Defendant's Exhibit 18.

conditions. Nor does it articulate what record evidence supports the conclusions reached. Moreover, an exacting review of the trial court's decision reveals that the reasons proffered for retaining the one-race schools are legally insufficient.

First among the district court's five reasons for permitting Tuscaloosa to retain several one-race elementary schools was that Tuscaloosa students' overall education experience would be in a desegregated environment. Students would spend grades six through twelve in desegregated schools. Only from kindergarten through fifth grade would any students attend racially identifiable schools.

■ In considering appropriate desegregation measures, the district judge properly viewed the system as a whole, not focusing on the racial balance of individual schools. *See Carr v. Montgomery County Board of Education*, 377 F.Supp. 1123, 1137–38 (M.D.Ala.1974), *aff'd*, 511 F.2d 1374 (5th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). Clearly, the existence of a few one-race schools does not in itself offend the constitution. *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). If one-race schools do exist in a system with a history of segregation, however, the school authority purportedly attempting to dismantle its dual system bears the burden of showing that such schools' racial composition does not derive from present or past discriminatory action. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 26, 91 S.Ct. at 1281; *Flax v. Potts*, 464 F.2d 865, 868 (5th Cir.), *cert. denied*, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972). The United States Supreme Court in *Swann* established a presumption against schools substantially disproportionate in racial composition. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 26, 91 S.Ct. at 1281. In reviewing desegregation plans proposing one-race schools, courts must scrutinize the schools to make

sure that the authorities' reasons for retaining them can surmount the presumption of unconstitutionality. *Id.*

■ The desegregation plan in this case fell short of its constitutional goal, the district court improperly having concluded that overall desegregation was achieved because Tuscaloosa students would spend more than half their grades in a totally desegregated environment. The court in *Carr v. Montgomery County Board of Education*, 377 F.Supp. 1123 at 1137–38, did successfully utilize similar reasoning in approving a desegregation plan which retained some virtually one-race elementary schools. That plan, however, achieved much greater desegregation success than does the plan now before us, both in the overall system and also in the elementary grades. The district court in *Carr* indicated by specific findings of fact that the plan effected the maximum degree of stable desegregation. For example, under the *Carr* plan, about 18% of elementary age black students attend schools 95% or more black. As seen earlier, about 67% of Tuscaloosa's black children would attend elementary schools more than 95% black.

■ Moreover, the relatively limited number of one-race schools permitted in *Carr* resulted in part from racially segregated housing patterns. The trial court's specific factual findings in *Carr* suggested that the logistical imperatives deriving from the city's size and housing pattern foreclosed desegregation of all the one-race schools. *Cf. Stout v. Jefferson County Board of Education*, 537 F.2d 800 (5th Cir. 1976) (holding that dangerous routes foreclosed transportation of students). In the present case, the district court also held that the predominantly one-race schools did not transgress constitutional standards, since any present segregation in the early grades results from residential patterns. Unlike the *Carr* court's conclusion that logistical difficulties prevented dismantling every one-race school, the present district court's conclusion implies that the racial imbalance in Tuscaloosa's elementary schools results not from *de jure* segregation

but rather from demographic changes occurring since the school board's 1970 attempt to desegregate with neighborhood geographic attendance zones. The court's conclusion that residential patterns could justify racial disparity was premature. Not until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools. *Flax v. Potts*, 464 F.2d 865 (5th Cir.), *cert. denied*, 409 * MESSAGE(S) *MORE SECTIONS FOLLOWU.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972). Notwithstanding the school authorities' apparent good faith attempt to desegregate in 1970, the system has never achieved unitary status. *Lee v. Tuscaloosa City School System*, 576 F.2d at 40. Consequently, the school board in Tuscaloosa is still under an affirmative duty to dismantle the dual system, regardless of current housing patterns. *Flax v. Potts*, 469 F.2d at 868–69.

Second among the district court's reasons for permitting the predominantly one-race schools to survive was the majority to minority transfer plan already in effect. Under the transfer system, the school system provides free transportation for any student member of a majority race at one school who wishes to transfer to a school in which he would be in the minority. According to the court, increasing numbers of elementary age black students had been transferring to predominantly white schools. However, a review of the record, bolstered by appellees' candid remarks, reveals that the actual numbers of students transferring was minimal, although rising relatively rapidly. Record, vol. V at 79, vol. VI at 319–20. From the institution of the transfer plan in 1971 through 1979, a total of 167 black students transferred to white schools; no whites transferred to predominantly black schools. Record, vol. V at 79. Seventy-five of the total number of those transferring were elementary age pupils who changed schools for the 1978–79 school year; fifty elementary pupils transferred the preceding year. Defendant's Exhibit 7.

■ *Swann* and its progeny teach that such transfer programs may be valuable

components of a desegregation program. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 26–27, 91 S.Ct. at 1281–1282. By this late date, however, such cases have made axiomatic the duty of school authorities to devise "a plan that promises realistically to work, and promises realistically to work *now*." *Green v. County School Board of New Kent County*, 391 U.S. 430, 438–39, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968); *Weaver v. Board of Public Instruction of Brevard County, Florida*, 467 F.2d 473 (5th Cir. 1972), *cert. denied*, 410 U.S. 982, 93 S.Ct. 1498, 36 L.Ed.2d 177 (1973). The transfer program in Tuscaloosa is not effecting elementary school desegregation with adequate vigor and speed. Consequently, the school authorities must find other paths to the goal, although the transfer program may well remain one of the routes.

The district court's third reason for permitting the one-race schools attendant to Tuscaloosa's neighborhood attendance zone plan was educators' unified opposition to noncontiguous zone pairing and cross-town busing. Busing would have been necessary to pair noncontiguous attendance zones, and such pairing was the only method the parties found which would eliminate every one-race elementary school. Experienced educators of both races indicated that busing would impose serious time and transportation burdens on pupils, their parents, and the school system itself. Black educators particularly stressed that the disadvantages of cross-town busing would significantly outweigh the educational advantages of desegregation of the early grades. Cited as more important than desegregation was the stability inherent in attending a school near home and family for several years, especially in the presence of siblings and other children of different ages. Additionally, educators testified that pairing of grades would disrupt an individualized instruction program which encompassed several grades.

■ From this testimony and other evidence, the district judge apparently deduced that busing would disrupt the education process, and therefore was not "reason-

able, feasible, workable, effective, and realistic." *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 31. The somewhat limited fact findings given us and what we have gleaned from the record do not present circumstances which would render unreasonable some plan which incorporates pairing and possibly busing. As this court has remarked before, pairing is a reasonable alternative to one-race schools. *Allen v. Board of Public Instruction of Broward County, Florida*, 432 F.2d 362, 367 (5th Cir. 1970), *cert. denied*, 402 U.S. 952, 91 S.Ct. 1609, 29 L.Ed.2d 123 (1971). If the decision were ours initially, we might pay greater heed to the educational disadvantages of the rapid dismantling of a dual system. We may not, however, weigh advantages against disadvantages, for that judicial balancing has already been accomplished. The law orders eradication of all vestiges of the dual system, if some feasible plan can be devised. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 15, 31, 91 S.Ct. at 1275, 1283.

█ Fourth among the reasons found to justify the one-race schools was that the percentage of Tuscaloosa's elementary grade students attending schools more than 90% black would be considerably smaller than the percentage rejected as unconstitutional in *United States v. Board of Education of Valdosta, Georgia*, 576 F.2d 37 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978). Because *Valdosta* did not in any way establish the threshold for impermissible segregation, we also find this rationale inadequate to allow five one-race schools to survive. Indeed, *Valdosta* teaches that achieving desegregation in the rest of the school system does not relieve school authorities of their obligation to desegregate the elementary grades as well, in order to attain a comprehensive unitary system. *Id.* at 38.

█ The district court's fifth and final reason for allowing the school system to retain several one-race elementary schools was that the expense and other problems attendant to busing would disrupt the edu-

cation process. The judge concluded that the Tuscaloosa City School System lacked experience in the kind of complex busing arrangements that would be necessary for the noncontiguous pairing proposed by government counsel. The record in this case does suggest that a new busing program would pose considerable expense. Additionally, acquiring sufficient gasoline for extensive busing could be difficult. The record does indicate, however, that the school system does have at least minimal experience in busing. Without more detailed findings by the court, we cannot know whether these difficulties would be prohibitive. Clearly, cost alone cannot justify continued infractions of constitutional principles. *See United States v. Texas Education Agency*, 532 F.2d 380, 397–98 (5th Cir.) *vacated on other grounds and remanded*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976). If the problems attendant to busing, however, loom large and insurmountable, some plan may yet be devised which would minimize any noncontiguous zone pairing. Resolving such practical dilemmas is for the district court, who in the discretionary exercise of his equitable powers must frame a creative solution. *See generally Lemon v. Bossier Parish School Board*, 566 F.2d 985, 989 (5th Cir. 1978).

█ Having found the district court's rationale insufficient to permit one-third of Tuscaloosa's elementary schools to remain segregated, we must remand for that court to revise its desegregation order. Unfortunately, the guidelines we can proffer will render little concrete assistance, for the constitutional boundaries in school desegregation cases necessarily remain nebulous. *See Swann v. Charlotte-Mecklenburg Board of Education*, 401 U.S. at 28, 91 S.Ct. at 1282 (holding that "no fixed or even substantially fixed guidelines can be established as to how far a court can go"). That the present plan falls without those boundaries, however, is manifest: four predominantly black schools constructed and utilized during a period of *de jure* segregation can no longer be tolerated.

We do not adopt the government plan, and express serious reservations about its ambitious plans for noncontiguous zone pairing of elementary grades. The plan is in several respects somewhat callous to the needs of students and their parents. Moreover, the record reveals that the government drew into its noncontiguous pairing plan three elementary schools which are not racially identifiable. Record, vol. VII at 648.

Accordingly, we leave to the trial court's discretion the revision of the plan. Focusing on the target of a unitary system rather than a systemwide racial balance, the court may devise a constitutional plan that temporarily or permanently leaves one or more racially identifiable elementary schools, or that omits some of the earlier grades from the busing program. *See generally United States v. Board of Education of Valdosta, Georgia,* 576 F.2d at 39. Although no guarantee of constitutionality may be derived from such evidence, the record does reflect that one government witness previously testified that grades one through three could possibly be omitted from a pairing or grouping program without unlawful results. Record, vol. VIII at 753. *But cf. Mills v. Polk County Board of Public Instruction,* 575 F.2d 1146, 1147 (5th Cir. 1978) (disallowing segregation in grades one and two when no justification was articulated). The government itself raises no objection to exempting kindergarten age pupils from any busing program. Whatever the result of the revision, detailed fact findings by the district court will reveal what prevailing circumstances motivate any variation from complete desegregation of Tuscaloosa's schools.

Because the current desegregation plan for the Tuscaloosa City School System retains vestiges of state-imposed segregation, the district court's order adopting the plan is VACATED and the case REMANDED for further consideration and modification in accordance with this opinion.