UNITED STATES of America

v.

SOUTH PARK INDEPENDENT
SCHOOL DISTRICT et al.

Civ. A. No. 6819.

United States District Court,
E. D. Texas,
Beaumont Division.

June 6, 1980.

John H. Hannah, Jr., U. S. Atty., Tyler, Tex., Drew S. Days, III, Asst. Atty. Gen., Joseph D. Rich, Daniel L. Jennings, U. S. Dept. of Justice, Washington, D.C., for plaintiff U. S.

Tanner T. Hunt, Jr., Wells, Peyton, Duncan, Beard, Greenburg, Hunt & Crawford, Beaumont, Tex., for defendant South Park Independent School Dist.

R. Leon Pettis, Beaumont, Tex., Joe H. Tonahill, Tonahill & Hile, Jasper, Tex., for intervenor parents and students.

## MEMORANDUM OPINION ON REMAND[1]

JOE J. FISHER, District Judge.

Pursuant to the mandate of the United States Court of Appeals for the Fifth Circuit, this Court held an additional hearing for the purpose of "determining whether or not the [South Park Independent School District ("SPISD" or "District")] is in fact a 'unitary' school system" and whether the

---

1. This memorandum opinion constitutes the additional findings of fact with conclusions of law as required by the remand order of the United States Court of Appeals for the Fifth Circuit. *See United States v. South Park Ind. School Dist.*, 566 F.2d 1221, 1225–26 (5th Cir. 1978).

reassignment of principals by the District prior to the 1977–1978 school year "was done without regard to the race of the individuals involved."[2] *United States v. South Park Ind. School Dist.*, 566 F.2d 1221, 1225–26 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978).

 Because this Court finds that its school desegregation order of 31 August 1970 ("1970 Order" or "desegregation Order") created a unitary system for the SPISD by implementing a racially neutral attendance zone for each school, it concludes that it is without jurisdiction to consider the United States' motion for "supplemental relief" seeking an order requiring the SPISD to come forward with additional plans to desegregate the students within the District. *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 434–37, 96 S.Ct. 2697, 2703–04, 49 L.Ed.2d 599 (1976); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 31–32, 91 S.Ct. 1267, 1283–84, 28 L.Ed.2d 554 (1971). The Court also finds that there is insufficient evidence to support a finding that racial considerations played any part in the reassignment of principals by the District prior to the 1977–1978 school year. Thus, it is the conclusion of the Court that the SPISD violated neither the 1970 Order nor the Constitution of the United States in the principal reassignments. *See Singleton v. Jackson Mun. Sep. School Dist.*, 419 F.2d 1211, 1217–18 (5th Cir. 1969), *cert. denied*, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970).

## I

### A

On 31 August 1970, this Court entered an order ("1970 Order" or "desegregation Order") implementing a school desegregation plan for the SPISD. The language, intent, and effect of the 1970 Order was to "establish a unitary school system in [the] . . . District." The desegregation Order provided, with one exception, for the desegregation of the student body in the District schools by a neighborhood school plan. Under the plan, attendance zones were drawn encompassing each of the three high schools, four junior high schools (now middle schools), and eleven elementary schools. As an exception to the neighborhood school concept, a majority-to-minority transfer option was included. Under this scheme, a student who is assigned to a school in which a majority of the students are of his race may elect to attend any other school in the SPISD in which members of his race are a minority. Students who elect this option are given transportation by the District to the school of their choice.[3] Further, these students are given priority for space in any school which they elect to attend—not merely the closest SPISD school in which their race is in the minority.[4]

The 1970 Order also provided for the desegregation of faculty and staff within the schools in the District. Under the desegregation Order, the ratio of Black teachers and staff to White teachers and staff in each school is within five percent (5%) of the ratio of Black teachers and staff to White teachers and staff in the District.

After entry of the 1970 Order none of the parties appealed. It became final.

### B

On 19 July 1976, nearly 6 years after entry of the desegregation Order, the United States moved for supplemental relief requesting that this Court order the SPISD to develop, adopt, and implement a comprehensive school desegregation plan which would satisfy the requirements of subse-

---

**2.** The hearing took 4 days. The testimony of 49 witnesses was heard; much undisputed statistical evidence was presented.

**3.** Although the SPISD is only required to furnish transportation if it is available from District-controlled sources, the District furnishes bus transportation to all students electing the majority-to-minority transfer option.

**4.** No other specific exemptions to the attendance zones were permitted under the 1970 Order, other than for certified special education students and high school seniors in the 1971 classes at the three District high schools.

quent pronouncements of the Supreme Court of the United States and the United States courts of appeals in school desegregation cases.[5] No allegation was made that the SPISD had failed to comply with the 1970 Order.

On 11 August 1976, approximately 1500 parents and students ("Parents and Students") living within the District moved to intervene as a class representing themselves and others similarly situated.

A hearing was held on 16 and 19 August 1976. It was the position of the SPISD that it had remained in full compliance with the terms of the 1970 Order, that agencies of the United States had consistently approved the District's implementation of the 1970 Order, that the differences in the racial composition of schools from those anticipated in 1970 when the desegregation Order was entered were the result of changed residential patterns beyond the District's control, that since 1970 the SPISD had been guilty of no segregative acts, and that the 1970 Order was the most educationally sound and constitutionally acceptable integration plan available to the District. The United States presented oral argument in support of its motion and in opposition to the motion to intervene of the Parents and Students. Several witnesses were called by the SPISD to substantiate its position. No testimony was offered by the United States.

On 9 September 1976, an order was entered denying the motion for supplemental relief of the United States and granting the motion to intervene of the Parents and Students. This Court found that while some of the SPISD schools reflected a lesser percentage of desegregation than had been anticipated, other schools reflected a greater degree of desegregation than had been expected in 1970, and that evidence established that the desegregative results at schools differing from those anticipated in 1970 were the consequence of changed residential patterns beyond the control of the District. Moreover, it was apparent that the District had taken no affirmative action with segregative intent since 1970, nor refrained from taking any action within the scope of the 1970 Order which, if taken, would have increased the segregative results at those schools where the degree of desegregation was less than anticipated. This Court also found that the neighborhood school plan, as set out in the desegregation Order, dissolved all vestiges of a dual system. Thus, having specifically found a unitary system established by its 1970 Order, this Court concluded that it had no jurisdiction to consider the motion of the United States for supplemental relief.

The United States appealed.

### C

In March of 1977, the SPISD announced that all principals would be reassigned to different schools for the 1977–1978 school year. These new assignments did not alter the level of desegregation of faculty and staff in any school inasmuch as the unintended result of the reassignments was to place White principals in positions formerly held by White principals, and Black principals in positions formerly occupied by Black principals.

On 8 August 1977, the United States filed an application for an order to show cause

---

5. The motion of the United States was preceded by a letter of 15 April 1976 from the Department of Justice to counsel for the District. The letter, the first indication that the United States was dissatisfied with the District's assignment of pupils to schools since the entry of the desegregation Order on 31 August 1970, advised that "additional steps need[ed] to be taken in order to bring the district into compliance with Federal law." That the United States would take such a position was somewhat surprising to the District as in each year since 1970 the United States Department of Health, Education, and Welfare (now Department of Education) had approved the student assignment plan being used by the SPISD under the 1970 Order. Nevertheless, at the request of the Department of Justice, the SPISD administrative staff conducted an intensive study to determine whether an alternative plan might be devised which would produce greater student desegregation at certain schools. Following the study, the District concluded that the plan promulgated by the 1970 Order was the most educationally sound plan available under the circumstances.

why the SPISD should not be required to comply with the 1970 Order insofar as it relates to the assignment of faculty and staff of the District. It was the contention of the United States that the SPISD had violated the 1970 Order by reassigning Black principals to schools which had a majority of Black students and White principals to schools in which White students were in the majority.

After hearing the application of the United States, this Court found that the racial composition of none of the SPISD schools was indicated by the principal reassignments, that the reassignments did not produce a decrease of faculty and staff integration in the District,[6] and that the SPISD had fully complied with the 1970 Order in the principal reassignments. Accordingly, the application was denied.

The United States appealed.

**D**

On appeal to the United States Court of Appeals for the Fifth Circuit, the order denying the motion of the United States for supplemental relief (student desegregation) was joined with the order denying the United States' application for an order to show cause (principal reassignments). The court of appeals reversed and remanded for additional findings to support this Court's rulings. *United States v. South Park Ind. School Dist.*, 566 F.2d 1221, 1225–26 (5th Cir. 1978). A rehearing *en banc* was denied. *United States v. South Park Ind. School Dist.*, 569 F.2d 1155 (5th Cir. 1978) (table).

The Supreme Court of the United States denied certiorari. *Board of Educ. v. United States*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978). Two Justices dissented.

*Id.* A rehearing was denied. *Id.* 439 U.S. 1135, 99 S.Ct. 1059, 59 L.Ed.2d 98.

**II**

In focusing attention of the issue of school desegregation by eliminating the racial identifiability of the SPISD schools, it is important to clarify exactly what this Court did *not* do in its 1970 Order. First, unlike the practice required when a court implements a "step at a time" plan, it was unnecessary for this Court in the 1970 Order to "specifically retain[ ] jurisdiction of [the] cause." *See, e. g., Carr v. Montgomery County Bd. of Educ..*, 289 F.Supp. 647, 654 (M.D.Ala.), *modified*, 400 F.2d 1 (5th Cir. 1968), *rev'd*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) (order of district judge reinstated as entered). Nor did this Court in 1970 choose to implement a desegregation plan which would require periodic reexamination and reappraisal to determine when a unitary system finally had been obtained. Instead, from the desegregation plans submitted by the United States and the District, this Court devised a plan which, by immediately eliminating the vestiges of a dual system, achieved for the SPISD a unitary school system and the first paragraph of the 1970 Order implementing the plan so states:

**ORDER FOR IMPLEMENTATION OF SCHOOL INTEGRATION PLAN**

The Court having heard testimony in open hearing and having considered the arguments of counsel for the United States of America and for Defendant South Park Independent School District with respect to *the immediate implementation of a school integration plan designed to establish a unitary school sys-*

6. The SPISD announced the reassignment of assistant principals for the 1977–1978 school year along with the principal reassignments. The two high schools with majority White student populations, Forest Park High School and South Park High School, would continue to have Black assistant principals. As in the past, the predominantly Black high school, Hebert High School, would have a White assistant principal. For the first time, a middle school populated by a majority of White pupils, MacArthur Middle School, would have a Black assistant principal. Thus, the effect of the reassignment of assistant principals for 1977–1978 was to maintain the prior level of desegregation among school building faculty and staff except at MacArthur Middle School where staff desegregation was increased by the addition of a Black assistant principal.

*tem* in South Park Independent School District,

It is ordered that the Board of Trustees of South Park Independent School District proceed to implement, not later than September 2, 1970, the following desegregation plan:

(emphasis added).

A

By entry of the 1970 Order, this Court concluded that the establishment of a neighborhood school attendance plan, together with the introduction of a majority-to-minority transfer option and faculty and staff desegregation, established a unitary system. The 1970 Order was based on then current demographic information presented during the 1970 hearings and accepted by both the United States and the District. This information indicated that only two of the District's then eighteen schools were likely to retain student racially identifiability. These two schools, Blanchette Elementary School and West Oakland Elementary School (now Price Elementary School), were small elementary schools with limited attendance zones. Blanchette Elementary School served kindergarten through fourth grade students; West Oakland served students in grades one through six. The remaining schools, the three high schools, four junior high schools (now known as middle schools), and the other nine elementary schools, would lose all vestiges of student racial identifiability under the attendance plan set out in the 1970 Order.

■ The importance of this finding, that the Court established a unitary system with the entry of the 1970 Order, cannot be understated. For once a court finds that a school district has achieved a unitary status, absent a further segregative act, it loses jurisdiction over the matter. *See Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 434–37, 96 S.Ct. 2697, 2703–05, 49 L.Ed.2d 599 (1976).

This concept is best illustrated by the recent decision of the United States Court of Appeals for the Fifth Circuit in *Lee v. Macon County Board of Education. Lee v.*

*Macon County Bd. of Educ.,* 584 F.2d 78 (5th Cir. 1978). In a proceeding in 1977 to reopen a school, a United States district court entered an order which found that the Baldwin County, Alabama school system, which had been operating under a 1970 court-ordered desegregation plan, was "desegregated and . . . unitary in nature." *Id.* at 81. No objections to the order were filed.

Subsequently, the United States and other parties intervened to prevent the school from reopening. When the intervenors were denied the relief that they sought, some of them appealed.

The Fifth Circuit first considered whether the district court had subject matter jurisdiction over the proceedings.

Federal district courts possess jurisdiction over school desegregation cases only because of unconstitutional action by the state or by the local school board. The magnitude of the constitutional violation, the scope of the remedy required to redress the violation, and the possibility of recurring violations have all made it necessary for the district courts to retain jurisdiction over many such cases in order to insure the proper implementation of the desegregation plan and the achievement of the ultimate goal—a unitary school system in which the State does not discriminate between public school children on the basis of their race.

*Id.* Having established these ground rules, the court continued:

But once that goal has been attained, the district courts may then follow the orderly procedures previously outlined by this Court and enter an order that the school system is indeed unitary.

*Id.* Then, applying the *Swann* decision of the United States Supreme Court, the Fifth Circuit stated:

Normally, a court could then close the docket on the case, and "in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial

composition of the schools, further intervention by a district court should not be necessary."

*Id.* (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971)).

## B

 Nevertheless, because some of the SPISD schools have reflected a lesser degree of desegregation than was anticipated under the 1970 Order, it is necessary to inquire whether either the SPISD or the State of Texas "has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the [District] schools." [7] *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 32, 91 S.Ct. 1267, 1284, 28 L.Ed.2d 554 (1971). If so, the jurisdiction of this Court is again triggered to remedy the violation. *Id.* The Court is, however, unable to find any evidence presented at either the 1976 hearing or the 1979 hearing which would indicate that a deliberate action of the SPISD or of the State of Texas has affected the racial composition of any school and thus concludes that it is without jurisdiction.

To be sure, the racial composition at several of the District schools is significantly different from that projected in 1970 when the desegregation order was entered. Yet, it cannot be disputed that the cause of this disparity is due to a change in residential patterns subsequent to the implementation of the 1970 Order. Clearly, that certain schools are currently attended by students of predominantly one race is not the result of present or past discriminatory action by the District or by Texas. Rather, the evidence establishes that this situation has come about since 1970 as the result of four factors: (1) a mass exodus of White resi-

dents from the Hebert High School, the Odom Middle School, the Fehl Elementary School, and the Tyrrell Park Elementary School attendance zones; (2) a significant and continuing decline in student enrollment coupled with an increase of almost ten percent (10%) in the proportion of Black students in the District; (3) the decision of some students to attend private schools; and (4) based on an abundance of evidence presented during the 1979 hearing, the efforts of some White parents residing in the Tyrrell Park area to avoid sending their children to Hebert High School and Odom Middle School by creating guardianships and other legal means.[8]

The migration of White students from the Hebert High School, the Odom Middle School, the Fehl Elementary School, and the Tyrrell Park Elementary School attendance zones was best reflected by the undisputed testimony of Professor Charles Hawkins of Lamar University. Professor Hawkins, an expert witness in economics and demographic statistics, testified that in the 9 years since the 1970 Order was entered by this Court several residential areas within the District experienced significant changes in racial composition. Professor Hawkins testified that the Fehl Elementary School attendance zone and a part of the Tyrrell Park Elementary School zone, both densely populated neighborhoods comprised primarily of single-family dwellings, had changed from predominately White to predominately Black. Both of these neighborhoods are also within the Hebert High School and Odom Middle School attendance zone and were projected in 1970 as the White residential areas which would desegregate those particular schools. It was also Professor Hawkins' expert opinion that the

7. Although it was the position of the District during both the 1976 hearing and the 1979 hearing that whether the SPISD had deliberately attempted to fix or alter demographic patterns to affect the racial composition of the District schools was not in issue as the United States' motion for supplemental relief had suggested no such violation, the Court was of the opinion that the United States should have an opportunity to develop this issue.

8. Although this phenomenon was generally limited to White parents, there was evidence presented in 1979 to indicate that some Black parents have employed these same devices to circumvent the efforts of the District to enforce the 1970 Order so that their children might attend the predominantly Black Odom Middle School and Hebert High School rather than the school in their neighborhood attendance zone.

construction of three major housing complexes, which are occupied predominantly by Black families, has added to the racial imbalance at Hebert High School, Odom Middle School, and Fehl Elementary School. Corresponding to the changes in the Hebert High School, the Odom Middle School, the Fehl Elementary School, and the Tyrrell Park Elementary School attendance zones, Professor Hawkins believed that most of the other attendance zones within the District continued with the same racial composition as in 1970.

Professor Hawkins also presented information from the Texas Education Agency which indicated to him that since the implementation of the desegregation Order the SPISD has undergone a steady decline in overall enrollment and a steady increase in the proportion of Blacks in the student body. He testified that during this same period other area school districts with predominately White enrollments, such as the Lumberton School District and the Vidor School District, experienced dramatic increases in White student enrollments. For example, the enrollment at the Lumberton School District, located five miles north of the SPISD, has doubled.

The evidence presented at both the 1976 and the 1979 hearings clearly established that no action or inaction by the District since the entry of the desegregation Order had, as a natural and foreseeable consequence, a segregative effect on the student body within any school or the District. The SPISD has since 1970 neither opened new schools nor closed existing ones which would affect the racial composition at any District school. Indeed, there was evidence presented during the 1979 hearing which established that the District had taken several steps to increase the overall level of student desegregation. The present superintendent of schools testified that the Dis-

trict has, for several years, rotated its secondary school summer program among the three high schools in order to increase student desegregation. He also testified that the District promotes the majority-to-minority transfer option in local daily newspapers and in the schools.

Additional action taken by the District for the purpose of increasing the level of student desegregation includes scheduling different vocational, language, and other courses in the three high schools. Students electing to attend these courses leave the high school within their attendance zone for a part of each day in order to take one or more courses offered at another District high school. For example, Black students from the Hebert High School attendance zone may take courses at Forest Park High School, a majority White school, or at South Park High School. White students from those schools may take courses at predominantly Black Hebert High School. The attendance of these students, however, is reflected only in the records of the high school within their attendance zone.

In sum, because there is no evidence to support a finding that either the SPISD or the State of Texas has attempted to alter the demographic patterns to affect the racial composition of the District schools, and, in fact, evidence to support a finding that the SPISD acted within the strictures of the 1970 Order to increase the level of student desegregation, the Court must conclude that there is no jurisdiction to alter a previously established unitary system.

### C

■ Although the issue of compliance by the SPISD with the desegregation Order was never technically at issue during either the 1976 or the 1979 hearing,[9] since much

---

9. The motion for supplemental relief filed in 1976 did not allege noncompliance by the District with the 1970 Order. Indeed, when the Court inquired of counsel for the United States during the hearings in 1976 whether noncompliance was at issue, counsel for the United States indicated that it was not.

THE COURT: All right, I would inquire of counsel for the Government whether or not you are making the contention that the School District in some way has failed to comply with this Court's order of August 31, 1970.

MR. JENNINGS: No, sir, we are not contending that they have failed to comply . . . .

testimony was admitted during the 1979 hearing which established that some parents and students had falsified addresses and used other means to attend either an SPISD school other than the one in their attendance zone or a public school outside of the District, the Court believes that it is necessary to determine whether the evidence can support a finding that the conduct of the SPISD in enforcing the school attendance zones violated the terms of the 1970 Order.[10]

Immediately prior to the 1979 hearing, an investigation by the United States Department of Justice discovered twenty-nine White students living within the predominantly Black Hebert High School and Odom Middle School attendance zone who were attending a school outside of the zone. When the parents of these children were called, their testimony was consistent. First, once the District was apprised that any of these parents had children attending a SPISD school other than Hebert High School or Odom Middle School, the children were immediately enrolled in the correct SPISD school. Second, false addresses had been employed in most cases in an attempt to circumvent the 1970 Order and the efforts of the District to enforce it. And, it was evident that the parents who sought to avoid the effect of the desegregation Order were very much aware of the District's enforcement efforts. Thus, they felt it necessary to employ various devious tactics.

When the testimony of these parents is examined in the light of the District's active policing efforts, it is impossible for this Court to find a violation of the 1970 Order by the SPISD. Several persons testified that both District school administrators and the SPISD trustees understood that they were responsible for implementing without deviation the attendance zones in the 1970 Order. The District's director of attendance assisted principals in the enforcement of the attendance zones. Each of the SPISD principals was given a map depicting the attendance zone for his school and instructions for the enforcement of the school attendance zone. Each principal checked student enrollment cards against the maps and expelled any student found to be attending school out of zone. On numerous occasions the District's director of attendance went to student's homes to verify questionable addresses.[11]

### D

One additional point needs to be made. Following the 1976 hearing, this Court found that the United States' motion for supplemental relief had failed to provide notice to the SPISD of the details of any violation of equal educational opportunity or equal protection of the laws as required by section 259 of the Equal Educational Opportunities Act of 1974 ("Act"). 20 U.S.C. § 1758. In its opinion, the court of appeals apparently misinterpreted this

THE COURT: Now the Court would inquire—the Court doesn't wish to embarrass counsel, because maybe you had nothing to do with it at the time, but if you feel this way now, at the time you filed the motion, do you know why the Government did not feel this way in 1970, in taking an appeal from this Court's order of August 31, 1970?
MR. JENNINGS: I can't answer that.
THE COURT: You have no answer to that?
MR. JENNINGS: No, sir.
Transcript, *United States v. South Park Ind. School Dist.*, (E.D.Tex. Aug. 16, 1976). Nevertheless, when counsel for the United States raised the issue of the District's compliance with the 1970 Order in his opening statement in the 1979 hearing, the Court, in fairness, allowed the United States to present evidence during the hearing in an attempt to develop this issue.

10. The only evidence that could suggest noncompliance by the SPISD with the 1970 Order was that some students were attending a school other than the District school for their attendance zone. No evidence was introduced which would tend to prove that the District had altered either the feeder patterns from the elementary schools through the middle schools to the high schools or the attendance zones set out in the desegregation Order. Nor was it suggested that since the entry of the 1970 Order the SPISD deviated from the mandated level of faculty and staff desegregation.

11. In a September 1979 inspection focusing on student assignment, the Technical Assistance Division of the Texas Educational Agency found the SPISD to be in compliance in its enforcement of the 1970 Order.

finding to mean that the United States had failed to give the District notice of its dissatisfaction with the resulting effects of the 1970 Order. *See United States v. South Park Ind. School Dist.*, 566 F.2d 1221, 1226 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978). What the Court intended to find, and does now find, was that the United States had neither pleaded nor proved that the SPISD violated either the right to equal educational opportunity or the right to equal protection of the laws of District students. Because the Court finds as it does, it is foreclosed by the language and intent of the Act from "enter[ing] . . . any order for . . . modification of [the] court-approved plan." 20 U.S.C. § 1758.

### III

Having concluded that it does not have jurisdiction to consider the motion for supplemental relief, the Court turns to the contention of the United States that the SPISD unconstitutionally reassigned its principals immediately prior to the beginning of the 1977–1978 school year.

### A

█ The Court first concludes that the reassignment of principals by the SPISD has fully complied with that much of the 1970 Order which mandates that the ratio of Black teachers and staff to White teachers and staff in each school equal, within five percent (5%), the ratio of Black teachers and staff to White teachers and staff within the District.

It was not the intention of the Court in the 1970 Order to require that a school have as its principal a person of a particular race. Rather, the 1970 Order clearly and explicitly required that the overall racial composition of each District school was determinative of its racial identifiability. It was this Court's understanding then, *see Singleton v. Jackson Mun. Sep. School Dist.*, 419 F.2d 1211 (5th Cir. 1969), *cert. denied*, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970),

and it is now, *see United States v. South Park Ind. School Dist.*, 566 F.2d 1221, 1226 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978), that the overall racial composition of the faculty and staff of a school, rather than particular positions, was to be considered in deciding whether the school was racially identifiable. It was with this in mind that the faculty and staff portion of the 1970 Order was adopted. Thus, as it is not disputed that since the entry of the 1970 Order the ratio of Black teachers and staff to White teachers and staff in each District school has ever varied by more than five percent (5%) from the District-wide ratio, the Court must conclude that the terms of the 1970 Order have been fully complied with.[12]

### B

█ Moreover, because this Court recognizes, as did the court of appeals, *see United States v. South Park Ind. School Dist.*, 566 F.2d 1221, 1226 (5th Cir.), *cert. denied*, 439 U.S. 1007, 99 S.Ct. 622, 58 L.Ed.2d 684 (1978), that the assignment of principals alone may indicate the racial identifiability of a particular school or schools, this Court must also examine whether the reassignment of principals prior to the 1977–1978 school year was based upon racial considerations. The Court concludes that race was not a factor in the reassignment of principals for the 1977–1978 school year.

Testimony elicited during the hearing in 1979 established that the principal reassignments were not made on the basis of race, but rather to provide a new school superintendent with more meaningful faculty and staff evaluation from principals, to give principals who had been assigned to the same school for a number of years a new challenge, and to bring a fresh approach into various schools.

A number of factors, including experience, education, and other qualifications, were considered by the superintendent and his staff prior to making the assignments; race was not considered.

---

12. In each year since the implementation of the desegregation Order in 1970, the United States Department of Education (formerly Department of Health, Education, and Welfare), has determined that the SPISD was in compliance with that much of the 1970 Order relating to faculty and staff desegregation.

All administrators who were involved in the principal reassignments testified that neither the race of a particular principal nor the racial composition of a particular school was considered or discussed in making the reassignments. A member of the SPISD board of trustees testified that neither the race of a particular principal nor the racial composition of the student body at a particular school was considered or discussed when the board was presented with the proposed reassignments by the superintendent. She further testified that it was the policy of the District that race would not be a factor in the hiring, promotion, salary, or assignment or any employee. Indeed, all five of the Black principals who were reassigned for the 1977–1978 school year testified that they did not believe that race had been a factor in their reassignments.[13]

When these reassignments are examined against a background of complete faculty and staff desegregation within each school, and within the SPISD as a whole, it is even more difficult to find evidence of race entering into the decision to assign a principal to a school. Since the implementation of the 1970 Order, all principals, assistant principals, teachers, teacher aides, coaches, and other staff who work directly with students consistently have been assigned so that the racial composition of a school staff does not suggest that a school was intended for Black or White students. There are Black assistant principals assigned to every SPISD high school and middle school in which the majority of the members of the student body is White; conversely, there are White assistant principals assigned to every SPISD high school and middle school in which the majority of the members of the student body is Black. As part of the summer school, which rotates among the three high schools, a Black principal has served when the program was held at Forest Park High School, a school with an attendance zone of mostly White students, and a White principal has overseen the program when it was conducted at Hebert High School, a school with an attendance zone of mostly Black students. Currently a Black principal is assigned to Regina Howell Elementary School, a predominantly White school, and a White principal is assigned to Price Elementary School, a predominantly Black school.

In sum, when the proof produced at the hearing is considered as a whole, there is insufficient evidence to indicate that race was a factor considered by the SPISD in reassigning the District principals prior to the 1977–1978 school year.

## IV

To repeat, the Court concludes that having established a unitary school system for the SPISD in 1970, it is without jurisdiction to consider alternate desegregation plans. Further, there is insufficient evidence to suggest that the reassignment of principals prior to the 1977–1978 school year was based upon racial considerations.

 The Court recognizes that the decision reached today may seem incongruous to those within the community who are acutely aware of the several predominantly one-race schools within the District. It is, however, not so. Once a unitary school system has been established, our Constitution neither requires the maintenance of an ongoing racial balance in the public schools, *Milliken v. Bradley*, 418 U.S. 717, 740–41, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974), nor, without more, requires the dismantling of a school which is predominantly White or predominantly Black, *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 417, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 851 (1977). Rather, Our Supreme Law mandates that no system be structured to segregate the races. This rule was succinctly stated by the Chief Justice shortly after this Court had entered its 1970 Order:

13. That each school would be assigned a principal of the same race as that constituting the majority of the student body may be explained in part by the choice of school for reassignment made by each principal. None of the principals involved had requested assignment to a school in which their race was in the minority, and, in fact, most principals requested to remain at their original school where, prior to the reassignments, their race was the same as the majority of the student body.

Our objective . . . is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 23, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1974). Accordingly, the Constitution neither demands that a court periodically review a desegregation decree to conform to shifting residential patterns within a school district, nor, absent further segregative action by the district, places an obligation upon the court to remedy resegregation after an approved plan is implemented. *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 434–37, 96 S.Ct. 2697, 2703–05, 49 L.Ed.2d 599 (1976).

The findings made by this Court in 1976 are reaffirmed. The motion for supplemental relief of the United States is denied. The application for an order to show cause of the United States is denied. *It is so ordered.*