Arlene **FLAX** et al., Plaintiffs-Appellants,

v.

**W. S. POTTS** et al., Defendants-Appellees.

No. 71–2715.

United States Court of Appeals,
Fifth Circuit.

July 14, 1972.

Rehearing Denied July 21, 1972.

L. Clifford Davis, Fort Worth, Tex., William L. Robinson, Norman J. Chachkin, New York City, for plaintiffs-appellants.

Cecil Morgan, David B. Owen, Fort Worth, Tex., for defendants-appellees.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

DYER, Circuit Judge:

Following Swann v. Charlotte-Mecklenburg Board of Education,[1] we remanded this case with directions that the district court require the school board to forthwith constitute and implement a student and faculty assignment plan that would comply with the principles established by that decision. Flax v. Potts, 5 Cir. 1971, 450 F.2d 1118 [Flax I]. Subsequently the desegregation plan submitted by the Board was approved by the district court on July 30, 1971, and was implemented during the current school term. Appellants object to the plan as failing to achieve compliance with *Swann*.

At the outset, we commend the Superintendent and the members of the Board for their dedication to their heavy responsibilities and their good faith voluntary efforts to desegregate and eliminate inequality in the school system.[*] Moreover, they have cooperated in every way with the district court, including the formulation of a plan and the appointment of a bi-racial committee. On the other hand, the appellants' objections have been numerous but their contributions have been negligible. We must, nevertheless, once again remand the case because the record affirmatively shows that the plan has not yet fully established a unitary school system.

While the plan is effective in achieving a substantial amount of integration in the Fort Worth Independent School District, it falls short of meeting the mandate of *Swann* that all vestiges of state-imposed segregation be eliminated from the public schools. *Swann*, 402 U. S. at 15, 91 S.Ct. 1267. This is because of the existence in the school system, during both the 1970–71 and 1971–72 school years, of 16 unjustified virtually all-black, one-race schools, relegating almost 12,000 of the approximately 21,000 black public school students in Fort Worth to a constitutionally proscribed segregated education.

The eleven year journey of the Fort Worth Independent School District along the path of school desegregation was begun in 1961 when the first action in this protracted litigation sought an end to compulsory segregation in the school system. In 1962 the District's dual school system was held to be unconstitutional and the Board was ordered to file a plan for desegregation. Flax v. Potts, N.D. Texas 1962, 204 F.Supp. 458, aff'd Potts v. Flax, 5 Cir. 1963, 313 F.2d 284. In 1963 the Board complied, and the court approved a stair-step desegregation plan calling for the gradual, grade by grade integration of the Fort Worth schools. Since that original court-ordered desegregation, the Board has traveled alone in the integration process. The Board has undertaken its obligations largely by the voluntary implementation of self-designed integration plans developed to keep the school district abreast of judicial progress toward equality in educational opportunity, from *Brown I*,[2] through *Jefferson County*,[3] and finally to *Swann*. Following that decision, we found it necessary here, as in many of the school desegregation cases then pending before us, to direct the school board to revise its student assignment plan to meet its clearly defined constitutional obligations. They are the focus of this appeal.

We deal only with appellants' objections to the court-approved student assignment plan. While an objection was made on appeal to the Board's alleged

---

1. 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed. 2d 554.

* This court held a prehearing conference with the attorneys for the parties and invited the litigants to appear pursuant to FRAP Rule 33. Counsel for appellants and appellees and members of the Board of Education were present at the prehearing conference.

2. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

3. United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836, aff'd on rehearing en banc, 1967, 380 F.2d 385, cert. denied sub nom. Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.

failure to comply with our directive in *Flax I* that the decisions in *Singleton*[4] and *Carter*[5] be followed with reference to faculty assignment, appellants have not replied to the submission of the Board that our directive has been followed for the 1971–72 school term. We therefore pretermit discussion of that contention.

## The School System

During the school years 1970–71 and 1971–72, there were 117 public schools in operation in the Fort Worth Independent School District, 78 as elementary schools, 20 as middle or junior high schools, and 15 as high schools. In 1970–71, there were 88,313 scholastics in the system, as compared with 84,311 during the 1971–72 term. While the population of Spanish-surnamed students in the system has remained fairly constant over this period (9.5%), the ratio of black to white children in the schools has varied from 27%–64% in 1970–71, to 29%–61% in 1971–72.

Since before 1954, school attendance zones and student assignments in the district were based upon a neighborhood school policy at each educational level, with the following exception. Prior to 1967, the school district was divided, although on a neighborhood basis, into "White" and "Black" districts. Generally, the system was composed of overlapping dual attendance zones in which each neighborhood was simultaneously in a white zone and a black zone. Where, however, blacks resided in a zone in which there was no black school, the black children were required to attend school out of their neighborhood zone at the nearest all-black school. The same was true of white children who lived in a predominantly black neighborhood in which there was no white zone or white school.

In 1967, this dual zoning was eliminated and a true neighborhood school plan implemented. Because, however, of marked residential separation of races in Fort Worth, little integration was accomplished by this revision in student assignment.

## The Court-approved Plan

The first step in the Board's Comprehensive Plan was to adopt new elementary school attendance zones based on equidistant boundaries wherever predominantly black and predominantly white schools were contiguous. The minor adjustment in boundary lines occasioned by this change resulted in approximately 300 black children being moved into predominantly white schools.

The most significant provision of the new student assignment plan was the creation of elementary school "clusters" to include 27 of the District's 78 elementary schools. Each cluster consists of from three to seven schools operated as a unit, bringing together all black and white schools within its boundary and distributing their enrollment among the various facilities to achieve a ratio of black to white students that approximates the district-wide ratio. The 27 schools involved in the cluster plan included 11,000 students, 8,203 white and 2,797 black. There are 9,259 black elementary students presently enrolled in the Fort Worth Independent School District.

Finally, the Board's plan ordered the closing of previously all black Kirkpatrick and Terrell middle schools, the closing of previously all black Como and Kirkpatrick high schools, the reassignment of all those students thereby affected to integrated facilities, and the adoption of a majority-to-minority transfer program.

The appellants' objection to the plan is its failure to eliminate the one-race schools that exist in the Fort Worth Independent School District. During the 1971–72 term, the Board operated 11

4. Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 419 F.2d 1211.

5. Carter v. West Feliciana Parish School Board, 5 Cir. 1970, 432 F.2d 875.

all-black (88% or more black) elementary schools,[6] two all-black high schools,[7] and three all-black middle schools.[8] There are 40 all-white schools in the system.[9]

### All Black Schools

The existence of 11 all-black, one-race elementary schools in the 1971–72 term supported a segregated education for 6,415 of the district's 9,259 elementary age black children. These schools are not a part of the cluster program. Appellants seek their inclusion, contending that their continued operation as all-black violates the clear constitutional mandate that racial discrimination in public schools be eliminated "root and branch." Green v. County School Board, 1968, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716.

■ *Swann* teaches that the continued existence of one-race schools in a school system with a history of state-supported segregation is presumptively discriminatory and places upon school authorities the obligation of showing that such schools are "genuinely nondiscriminatory." *Swann, supra,* 402 U.S. 1 at 26, 91 S.Ct. 1267. There is no attempt here by the Board to make such a showing. Rather, the Board contends that it has no constitutional obligation to dismantle these all-black schools because their racial composition occurred as a result of shifting residential patterns since the district's establishment in 1967 of what it maintains was a unitary school system. The Board seeks refuge in language from *Swann,* in which the Court said that:

. . . Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of stu-

dent bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system.

*Id.* at 31, 91 S.Ct. at 1284.

■ But this language does not fit this case. There has never been a constitutionally adequate compliance by the district with its affirmative duty to create a truly unitary school system. Before and after 1967, nine of the eleven elementary schools were and are now virtually all-black schools. The vestiges of state-imposed segregation had in no significant manner been eliminated from the assignment of elementary school students. Likewise, the all-black middle and high schools further reflected, and continue to reflect, adversely on the existence of a unitary school system. Thus, there was in 1967 no "elimination of racial discrimination through official action," which is basic to the Court's suggestion in *Swann* that at some point in time the obligation to desegregate ends.

■ In speaking of the all black school, this Court has said that "where all-black or virtually all-black schools remain under a zoning plan, but it is practicable to desegregate some or all of the black schools by using the tool of pairing, the tool must be used." Allen v. Board of Public Instruction of Broward County, 5 Cir. 1970, 432 F.2d 362, 367. We have closely examined the location of the elementary schools in Fort Worth and find that it is both simple and practicable to include these all-black, one-race elementary schools in the cluster program. Indeed, they must be included, or an equally effective alternative remedy devised for the district to meet its constitutional obligation. *See* Boy-

---

6. Morningside (99% black enrollment), R. Vickery (99%), Dillor (90%), Mitchell Blvd. (85%), Eastland (88%), McCoy (100%), Dunbar (99%), Carver (99%), A. M. Pate (99%), E. VanZandt, (99%), and Carroll Peak (99%).

7. I. M. Terrell High (100% black enrollment), and Dunbar (100%).

8. Dunbar Middle School (99.5% black enrollment), Como Middle (100%), and Morningside Middle (99.9%).

9. 31 all-white elementary schools, 7 all-white middle schools, and 2 all-white high schools.

kins v. Fairfield Board of Education, 5 Cir. 1972, 457 F.2d 1091.

We have considered the Board's arguments to justify the existence of the virtually all-black middle schools and high schools. Over 50% of the district's black middle school students, 2,780 of 5,547 attend three all-black middle schools (Dunbar, Como, or Morningside). Over 40% of the district's black students of high school age, 2,522 of 6,090, attend two all-black high schools. The Board's plea that the location of Dunbar High School in an "exclusive black neighborhood," and the technical school nature of Terrell, gives justification for their imbalance, is not persuasive. We leave to the district court's determination whether, as has been represented to us, two of the three all-black middle schools will become integrated following their inclusion in cluster feeder plans in the 1972–73 school term. Otherwise, the student assignment plan must be revised to eliminate racial identifiability in these junior and senior high schools.[10]

## Grades K–1

Another prong of appellants' objection to the Comprehensive Plan approved by the trial court is the non-inclusion of kindergarten and first grade students in the cluster program. We find no justification for the non-inclusion of first grade students. They are part of the normal curriculum of the district and entitled to a full and equal integrated education. We believe, however, that because of the peculiarities of the kindergarten program, the limited nature of its operation, and the tender age and special needs of its students, its elimination from the over-all student assignment plan is neither unreasonable nor constitutionally impermissible. *See*

Lockett v. Board of Education of Muscogee County, 5 Cir. 1971, 447 F.2d 472 [1971]. The kindergarten pupils will therefore continue to attend the elementary school nearest their home conducting a pre-school program. However, for the parents of those children who so elect, the majority-to-minority transfer provision of the Comprehensive Plan must be extended to the pre-school level to make the pre-school program in any elementary school in the district available, provided the parent can arrange for the transportation of his child to that facility.

## New Construction and Renovation

In our original remand of this case following *Swann,* we directed the district court to enjoin the school board from "proceeding with the construction of a school that would be predominantly black." *Flax I, supra.* The order was designed specifically to prevent the construction of Morningside High School in a predominantly black area of Fort Worth. Relying upon assurances of the Board that it would comply with our directions, the district court has not issued such an injunction. We see no need for such an order in light of the good faith assurances by the Board to the court that such construction will not occur. *Swann* makes it clear that "in devising remedies where legally imposed segregation has been established, it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system." *Swann, supra,* 402 U.S. 1 at 21, 91 S.Ct. 1267 at 1279. The district court is charged with exercising continuing supervisory jurisdiction over the system and responsibility rests with it

10. Based upon enrollment statistics submitted to us by the School Board, our determination that only 21,000 blacks are enrolled in the school system is somewhat at variance with the statistics which indicate that in the year considered, 1971–72, there were some 24,000 black students in the system. We have simply added the total enrollment of blacks in each school in the district listed on Board's Exhibit 3. We note these disparities, but we find them not to be significant to this discussion.

and the Board to insure respect for our decree against construction of segregated facilities.

The judgment of the district court is reversed and the case is remanded to the district court with directions that the plan be modified and extended to comply with the principles announced in *Swann* as amplified by this opinion. This shall be accomplished so that it may be put into effect for the 1972–73 school term.

Reversed and remanded with directions.