**Tyrnn SMILEY, et al., Plaintiffs,**

v.

**Wayne BLEVINS, et al., Defendants.**

**Civ. A. No. 2643.**

United States District Court,
S. D. Texas,
Galveston Division.

May 26, 1981.

Weldon H. Berry, Richard P. Bell, Houston, Tex., for plaintiffs.

Edward H. Schwab, III, Galveston, Tex., for defendants.

Jeremiah Glassman, U. S. Dept. of Justice, Washington, D. C., for amicus curiae.

## MEMORANDUM OPINION

HUGH GIBSON, District Judge.

Pending before this Court is the motion of the defendants in this school desegregation case for modification of a Court order of June 16, 1978,[1] approving a plan submitted by the defendant school district for the desegregation of L. A. Morgan Elementary School, but conditioning that approval upon the realization of a percentage of black scholastics at Morgan not in excess of 50% by September 30, 1981. At present, the student population at Morgan is 63% black, and the defendants concede in advance of the September 30 deadline that the racial percentage required by the June 1978 order cannot be met. They urge, however, that the Court by insisting upon the establishment of this precise racial balance at Morgan, has fashioned a remedy whose scope exceeds the nature of the constitutional violation found. Defendants seek a relaxation of the racial tolerances, or in the alternative, a declaration that Morgan school is no longer racially identifiable.

The plaintiffs and amicus urge that the remedy appropriate in this case is one that realizes the maximum amount of desegregation practicable, that the racial percentages established in the June 1978 order are obtainable, and that, given the failure of the defendants' plan to obtain these percentages, the Court must order the defendants to implement an alternative plan which can realistically achieve these objectives. That plan, it appears, necessarily will require the non-contiguous pairing of Morgan and Parker Elementary Schools, and the forced busing of a substantial number of elementary age children.

Nearly three decades have elapsed since the Supreme Court of the United States, in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), issued its constitutional mandate to eliminate dual school systems and establish unitary systems at once. *Brown,* of course, spoke to the controlling constitutional principles; meanwhile, district courts and appellate courts have struggled with the flinty, intractable realities of day-to-day implementation of those principles, confronted in hundreds of cases with a multitude and variety of problems under the Court's general directive. Understandably, in an area of evolving remedies, federal courts have had to improvise and experiment without detailed or specific guidelines, and their efforts, of necessity, have embraced a process of "trial and error." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 6, 91 S.Ct. 1267, 1271, 28 L.Ed.2d 554 (1971).

The problem that this Court must grapple with today—and, in all probability, for the immediate future—is one that has confronted the Court and its predecessors since the inception of this protracted litigation: to define in precise and applicable terms the scope of the duty of the defendants and this Court in implementing *Brown* and its constitutional mandate. Tailoring a remedy commensurate to the constitutional violation identified here has proven an unwieldy task; for while the controlling principles, as always, shine with incandescent clarity, the contours of the instant constitutional violation are markedly dissimilar from those which heretofore have tested the mettle of fellow jurists, and the precise issue before the Court today, and the manner in which it has come to be, is in many respects unique.

---

1. *Smiley v. Vollert,* 453 F.Supp. 463 (S.D.Tex. 1978). Frank Vollert is no longer serving as superintendent of the GISD schools. Wayne Blevins, the current superintendent, has been substituted as a party-defendant.

The Court, it appears, has come to yet another fork in the road, and is called upon once again to reappraise the path it is constitutionally ordained to follow.

I.

Desegregation of the Galveston Independent School District has been the subject of judicial scrutiny since 1959. This civil suit was commenced as a class action on August 18, 1959, and prosecution of the original complaint culminated in Judge Ben Connally's order of January 23, 1961, implementing a "stair-step" freedom of choice plan aimed at totally dismantling the District's dual school system by September 1973. In 1969 the District abandoned the freedom of choice plan and implemented a neighborhood school assignment program which in operation achieved a greater degree of desegregation district-wide than required by the 1961 order, and did so more rapidly than required by that order. Grades 6–12 are now totally integrated, and have been for many years. The neighborhood plan has also achieved a significant degree of racial balance in the District's elementary schools.

As late as 1975, however, the plan had proven unsuccessful as a tool for desegregating three historically black elementary schools—Washington, Goliad and Carver. Washington, which ceased operations at the conclusion of the 1974–75 school year, was 85% black. Goliad and Carver, respectively, were 94% and 90% black. By comparison, the district-wide elementary school population was 41% black.[2] The physical facilities at Goliad, Washington and Carver were delapidated, test scores uniformly low, and the schools were clearly perceived in the community as inferior.

During the early 1970's, GISD on several occasions attempted to elicit voter approval of a bond issue to finance the construction of a modern educational facility to replace these antiquated schools. The District finally obtained voter approval for the project in 1975, and construction began on what is now the L. A. Morgan Elementary School. With this action, GISD took a significant step toward the final eradication of the vestiges of de jure segregation that permeated the Washington-Goliad-Carver schools and prevented the District from obtaining unitary status.

Although the creation of the Morgan school promised to correct many of the evils associated with the Washington-Goliad-Carver schools, the replacement of these facilities by Morgan, in conjunction with the continued use of a purely neighborhood student assignment policy, did not address the disproportionate racial imbalance present in the triumvirate of formerly black schools. Thus, after the District had reactivated this action in 1975 in connection with a dispute with HEW concerning termination of federal assistance under Title VI of the 1964 Civil Rights Act, the plaintiffs sought to enjoin the operation of Morgan until GISD implemented some plan to correct the likely racial imbalance in its scholastic population. At issue was the question whether the District's student assignment policy had achieved the unitary school system mandated by the Supreme Court in Brown v. Board of Education, supra.

This Court's distinguished predecessor, Judge Finis E. Cowan, after painstaking consideration, concluded that the District was not in compliance with Brown.[3] Although noting that GISD had made commendable progress toward eliminating every vestige of the prior de jure school systems "root and branch," the Court found that a single vestige of the dual system remained in the Washington-Goliad-Carver elementary schools, a vestige that would be perpetuated by the operation of Morgan under the District's student assignment policy.[4] While the Court found no evidence of

2. See Defendants' Exhibit No. 4.

3. Smiley v. Vollert, supra, at 483.

4. Id. at 481, 483. Although the Court found racial imbalance to exist at Gladnei O. Parker Elementary School as well, it tentatively concluded from the evidence before it as well as facts of which the Court had judicial notice that this imbalance was not the result of any past or present discriminatory action by the defendants. Id. at 479–80. No new evidence

present discriminatory intent in the District's commitment to the neighborhood school policy, nor in any other action in connection with Morgan, the Court found that the District in its single-minded reliance upon the neighborhood school assignment program had been remiss in its constitutional duty to take all practicable steps necessary to eliminate the final, lingering vestige of *de jure* segregation. The Court ordered the District to develop a plan to bring Morgan into compliance with constitutional directives.

On June 16, 1978, the Court entered an order approving a GISD plan to desegregate Morgan by implementing a district-wide majority-to-minority transfer program, and operating Morgan as a magnet school. The plan sought to attract white and Hispanic transfer students to Morgan, and to facilitate transfers of black students from Morgan to the prestigious and predominantly white Parker Elementary School. The Court believed that aggressive and enthusiastic implementation of the plan by the District would create a racial balance substantially identical to that of the district-wide elementary school population, given a suitable period of stability.[5]

Further, the Court determined that the District, in taking this "initial step" toward achievement of unitary status, would have to achieve certain percentage goals at Morgan. The Court set the following as minimally acceptable standards of performance under the plan:

(1) By September 1978, the percentage of black pupils at Morgan shall not exceed 73.69% (balance 7.19% white, 19.1% Hispanic);

(2) By March 1, 1979, the percentage of black pupils at Morgan shall not exceed 65% (balance equally divided between whites and Hispanics);

(3) By March 1, 1980, the percentage of black pupils shall not exceed 55%.(balance equally divided between whites and Hispanics); and

(4) By September 30, 1981, the percentage of black pupils at Morgan shall not exceed 50% (balance equally divided between whites and Hispanics).[6]

The Court unequivocally held that compliance with the mathematical ratios was essential to the efficacy of the plan:

[I]f the time-table established by this Court on page 469 of this opinion is not met, the Board and its administration must either abandon the magnet school concept or adopt programs which will cause Morgan school to become desegregated.[7]

The magnet plan exceeded the Court's racial percentage goals during 1978 and 1979. The March 1980 goal was not met, however, and the District concedes that the September 1981 quota cannot be obtained. In view of this, the Court is now required to decide whether the District should be permitted to continue to operate Morgan under the present approach, notwithstanding the clear import of the June 16, 1978 order, or whether the Court must mandate implementation of an alternative plan—one presumably requiring pairing and busing of a substantial number of elementary age children—in an effort to achieve compliance with the provisions of that order.[8]

## II.

The defendants' motion for modification of the June 1978 order came before the Court for hearing on February 23 and 24,

presented to this Court is in any manner suggestive to the contrary, and this Court expressly reaffirms Judge Cowan's findings as to Parker and all other elementary schools in GISD, save Morgan.

5. *See id.* at 467.

6. *Id.* at 469.

7. *Id.* at 477.

8. Judge Cowan did not require defendants to prepare a specific back-up plan in his June 1978 order, fearful that insistence upon a back-up plan would become a "self-fulfilling prophesy." *Id.* at 478. Thus if this Court concludes that the magnet plan has fallen short of its constitutional goal, it must determine which of the alternate plans, if any, can best remedy the violation at Morgan. Refer to Section IV *infra.*

1981. Both the plaintiffs and amicus oppose the motion, but, although united in their opposition, their positions are distinguishable. The plaintiffs' approach is straightforward: they argue that the June 16 order is in every sense valid, that the District has failed to comply with a binding order requiring it to implement a desegregation plan at Morgan to reduce the black population at the school to less than 50%, and that the Court must now order the District to implement a plan which realistically promises to achieve that racial balance and to achieve it now.

Amicus apparently concedes that the Court, if it decreed that the District must establish a fixed racial balance at Morgan to comply with the constitutional directive of *Brown,* exceeded its equitable powers. *See Swann, supra,* 402 U.S. at 24, 91 S.Ct. at 1280; *Pasadena Board of Education v. Spangler,* 427 U.S. 424, 438, n.5, 96 S.Ct. 2697, 2705 n.5, 49 L.Ed.2d 599 (1976). Amicus argues, however, that the Court, consistent with *Swann,* used the mathematical ratios only as a starting point in its analysis, and that use of these percentages was proper in fashioning "remedial criteria of sufficient specificity" to assure defendants' compliance with their constitutional duty. *See* 402 U.S. at 25, 91 S.Ct. at 1280.[9] Amicus suggests that the Court arrived at these percentages based upon its consideration of an alternative proposal, the so-called "Vollert Plan,"[10] which called for the non-contiguous pairing of grades 2–5 at Morgan and Parker. The Court concluded in its June 1978 order that immediate implementation of this plan would probably eliminate Morgan as a racially identifiable school, but declined to do so after concluding from the basis of decisional law in this circuit that mandatory busing of elementary age children was a remedy the Court could impose, if at all, only as a last resort.[11]

Interestingly enough, the evidence before the Court in 1978 indicated that adoption of the Vollert Plan would obtain a student population at Morgan approximately 62% black.[12] In light of this, the Court is skeptical of any contention that the percentage goals ordained in the June 1978 decree were derived from the likely effectiveness of the Vollert Plan as an integration tool. If anything, the mathematical ratios seem more influenced by Judge Cowan's conclusion that the magnet plan, if aggressively and enthusiastically implemented by the defendants, could achieve a racial mix at Morgan essentially identical to the district-wide population of elementary pupils in GISD. The defendants had pronounced their belief that this racial balance was obtainable under the plan, and had manifested their intention to work with the utmost diligence for the realization of this goal. It was imminently reasonable for Judge Cowan— and, indeed, it remains reasonable for this Court today—to expect defendants vigorously to pursue this objective and to encourage them in those efforts. *See Swann, supra,* at 26, 91 S.Ct. at 1281.

▪ Yet, the duty of the defendants in this instance, while making every effort to

9. Indeed, Judge Cowan stated: "In requiring this time-table, this Court is aware that the Court has no authority to decree that these percentages shall remain fixed and immutable forever." 453 F.Supp. at 469. Nevertheless, Judge Cowan indicated: "This Court does, however, have both the power and the absolute obligation under the law as enunciated in this circuit to require that these percentage goals be achieved as an initial step toward achievement of unitary status." *Id.* Refer to note 7 and accompanying text *supra.*

10. Galveston Independent School District, *A Plan to Achieve Ethnic Balance in Elementary Schools* (hereinafter "Vollert Plan").

11. 453 F.Supp. at 469–70, 474–76. The only uncertainty that Judge Cowan indicated might render the Vollert Plan constitutionally unacceptable was the possibility of "white flight." *Id.* at 470. While the Court's concern was not without merit, refer to note 22 *infra,* it is clear that the mere possibility of white flight would not prevent implementation of the Vollert Plan if it was constitutionally acceptable; and it is also clear that, once the plan had been implemented, attendance changes not caused by defendants and beyond their control would not render the plan constitutionally deficient. *See, e. g., Pasadena City Board of Education v. Spangler, supra.*

12. Vollert Plan, *supra* note 10, at 3.

achieve the maximum possible degree of desegregation, was and is to redress the continuing effects of the dual school system, not to achieve an ideal racial balance at Morgan. *Lee v. Tuscaloosa City School System*, 576 F.2d 39, 41 (5th Cir. 1978). *See Dayton Board of Education v. Brinkman*, 433 U.S. 406, 419–20, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977). And the proper function of federal district court, as Judge Cowan observed, is initially to assess the incremental segregative effect of the constitutional violation, and then to fashion a remedy commensurate with the nature of the constitutional violation. *See* 453 F.Supp. at 480.[13]

Once a constitutional violation is found, a district court may exercise its traditionally broad equitable powers to remedy past wrongs. *Swann, supra*, 402 U.S. at 15, 91 S.Ct. at 1275. Nevertheless, the case for displacement of local authorities by a federal court in a school desegregation case is a limited one, and the scope of any equitable remedy imposed by the court has been carefully circumscribed. The controlling principle consistently espoused by the Supreme Court in its seminal decisions in this area is that "the extent of an equitable remedy is determined by and may not properly exceed the effect of the constitutional violation." *Austin Independent School District v. United States*, 429 U.S. 990, 995, 97 S.Ct. 517, 519, 50 L.Ed.2d 603 (1976) (Powell, J., concurring); *see Dayton Board of Education v. Brinkman, supra*, 433 U.S. at 420, 97 S.Ct. at 2775; *Hills v. Gautreaux*, 425 U.S. 284, 294, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); *Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Swann*

*v. Board of Education, supra*, 402 U.S. at 16, 91 S.Ct. at 1276.

The clearest articulation of this principle to date perhaps is found in the high Court's pronouncement in *Dayton Board of Education v. Brinkman, supra*, 433 U.S. at 420, 97 S.Ct. at 2775:

The duty of both the District Court and the Court of Appeals in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the School Board which are [sic] intended to, and did in fact, discriminate against minority pupils, teachers, or staff. *Washington v. Davis*, [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)], *supra*.... If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the ... school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, ...

Thus, an equitable remedy should seek to approximate as closely as possible conditions which would have prevailed in the absence of any constitutional infraction, and a remedy is permissible only where the evidence supports a finding that the extent of integration sought to be achieved is that which would have existed had school authorities fulfilled their constitutional obligations in the past. *Austin ISD v. United*

---

**13.** While stating "It is admittedly difficult for this Court or any finder of fact, to determine what degree of desegregation would exist at the Morgan school" but for the constitutional violation, and noting the paucity of evidence on this point, *id.*, Judge Cowan concluded that "a large portion of the racial identifiability at the Carver-Washington-Goliad schools" was attributable to past action or inaction by the defendants. The Court found that the burden of establishing this degree of desegregation was upon the defendants, and that such proof had not been made. *Id.* at 481. Nevertheless,

Judge Cowan concluded that the early adoption of some plan like the Vollert Plan would probably have eliminated the racial identifiability of these schools. *Id.* at 480. Thus, Judge Cowan apparently concluded that the degree of desegregation that would have existed at Morgan but for the violation approximated that projected to obtain from the implementation of the Vollert Plan. There exists, however, a radical variance between this degree of desegregation and the racial percentages required in the June 1978 order, and as to the reasons for this variance the Court can only speculate.

*States, supra,* 429 U.S. at 995, 97 S.Ct. at 519.[14]

This Court has no occasion to consider *de novo* the incremental segregative effect of the constitutional violations identified heretofore. Judge Cowan's factual findings in this regard were and are fully supported in the voluminous record of this case. Nevertheless, those findings do not establish that the extent of the integration mandated by the Court in its June 1978 order would have existed at Morgan had defendants not fallen short of their constitutional obligations. Those same findings further reinforce Judge Cowan's conclusion that implementation of the Vollert Plan would have effectively desegregated Morgan.[15]

■■■ It is settled law in this circuit that a district court, in considering appropriate desegregation measures, should view the school system as a whole, not focusing on the racial balance of individual schools, and may not require that any fixed racial ratio of student population be achieved. *Lee v. Macon County Board of Education,* 616 F.2d 805, 809 (5th Cir. 1980); *Lee v. Tuscaloosa City School System, supra,* at 41; *Carr v. Montgomery County Board of Education,*

377 F.Supp. 1123, 1137–38 (M.D.Ala.1974), *aff'd,* 511 F.2d 1374 (5th Cir.), *cert. denied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). In light of these considerations, this Court is unable to avoid the conclusion that its distinguished predecessor erred in fashioning a remedy whose *sine qua non* was the achievement of any specific racial balance at Morgan, particularly where the evidence fails to show that the degree of integration required by the Court order would have existed absent any constitutional violation, and where the Court in dicta had given its imprimatur to a compulsory pairing plan whose implementation could not conceivably obtain the percentage of racial mixing required by the Court of the defendants' voluntary plan.

Thus, the Court finds that defendants' motion to modify the order of June 16, 1978, insofar as it seeks relief from the racial quotas therein established, is well taken and should be granted. That decision, however, is merely an embarcation point in this Court's inquiry; while the defendants' failure to achieve the racial percentages prescribed in the June 1978 order does not *per se* invalidate the magnet plan

---

**14.** *See generally* Kanner, *From Denver to Dayton: The Development of a Theory of Equal Protection Remedies,* 72 NW.U.L.Rev. 382 (1977).

**15.** Refer to note 13 *supra.* While the defendants have failed to prove the precise degree of desegregation that would have existed but for the constitutional violation, this does not relieve a federal district court from the responsibility of making such a finding pursuant to the shaping of an equitable remedy. This Court is naturally reluctant to alter in any degree Judge Cowan's June 16, 1978 order, reflecting as it does that Court's measured consideration of the evidence. Yet this Court is left with the firm conviction that the factual findings made by Judge Cowan pursuant to the directive of *Dayton Board of Education v. Brinkman* cannot support the racial percentages required by the June 1978 order. This Court cannot presume, in the absence of persuasive evidence, that the amount of integration that would otherwise have existed at Morgan would approximate the district-wide average. *See Austin ISD v. United States, supra,* 429 U.S. at 994–95, 97 S.Ct. at 519 (Powell, J., concurring). *But cf. United States v. Columbus Municipal Separate School District,* 558 F.2d 228, 231 n.11 (5th Cir. 1977),

*cert. denied,* 434 U.S. 1013, 98 S.Ct. 728, 54 L.Ed.2d 757 (1978).

This seems particularly evident where out of the six elementary schools in GISD (excluding Bolivar), the variance of racial attendance from the district norm at two schools heretofore determined not to be racially identifiable exceeds that at Morgan. *See* Defendants' Exhibit No. 1. In any event, as discussed in Section IV *infra,* in light of the decisions of both the Supreme Court and the Fifth Circuit Court of Appeals, there is no plan presently before this Court which it could permissibly require the defendants to implement that would achieve the racial percentages required by the June 1978 order. Thus, some modification of the June 1978 order is compelled, "in light of the circumstances present and the options available," *Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), and "taking into account the practicalities of the situation." *Davis v. Board of School Comm'rs of Mobile County,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). *See Estes v. Metropolitan Branches of Dallas NAACP,* 444 U.S. 437, 448, 100 S.Ct. 716, 721, 62 L.Ed.2d 626 (1980) (Powell, J., dissenting from dismissal of certiorari as improvidently granted).

and its correlative majority-to-minority transfer policy, it would be premature for the Court to conclude that defendants are complying with their constitutional obligation to eliminate immediately the vestiges of past discrimination "root and branch" without careful examination of the evidence now before it.

### III.

█ Initially, this Court must reject the defendants' contention that GISD has achieved unitary status. By now it is axiomatic that the existence of some small number of one-race, or virtually one-race schools within a district is not in and of itself the mark of a system which still practices segregation by law. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole. *Swann, supra*, 402 U.S. at 24, 91 S.Ct. at 1280; *Lee v. Macon County Board of Education, supra*, at 809. Nevertheless, in a school system with a history of segregation, schools with racially imbalanced [16] student populations bear a presumptive mark of racial identifiability, and the burden is appropriately cast upon school authorities to demonstrate that the racial composition at such schools is not the result of present or past discriminatory actions on their part. *Swann, supra*, 402 U.S. at 26, 91 S.Ct. at 1281. With respect to Morgan, this is a burden the defendants heretofore have been unable to meet.[17]

Relying on *Swann*, however, the defendants observe that racial composition is only one indication of segregation. Faculty, staff, transportation, extracurricular activities, and facilities are among the most important indicia of a racially identifiable school. *Id.* at 18, 91 S.Ct. at 1277.[18] Because Morgan was not in operation at the time of the June 1978 order, the defendants urge that significant new evidence now before the Court is demonstrative of the racial neutrality of Morgan.

With respect to these factors, it is undeniably true that invidious racial distinctions have been eliminated. The physical facilities at Morgan are unsurpassed in the District. A greater number of faculty and staff are employed at Morgan than at any other elementary school, enabling it to maintain the lowest student-teacher ratio in the District. Transportation and extracurricular programs are equal to those at any other school, and the academic program at Morgan is excellent.[19]

---

16. "Racial imbalance" denotes a situation in which the racial percentage of students in a given school or schools diverges markedly from the district-wide average. As *Swann* instructs, this imbalance is not a constitutional violation *per se*; rather, in a district with a history of *de jure* segregation, it is presumptive evidence of a violation. If the effect of this presumption is not overcome by a defendant, then the school in question is racially identifiable, and the racial disproportionality must be remedied insofar as is necessary "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken v. Bradley, supra*, 418 U.S. at 746, 94 S.Ct. at 3128.

17. *Smiley v. Vollert, supra*, at 471–72.

18. Even so, however, nothing in *Swann* intimates that, where racial imbalance in a school is traceable to past segregation, elimination of these additional indicia is sufficient to overcome the presumption of racial identifiability. To do so would approach resurrection of the "separate but equal" philosophy unalterably laid to rest in *Brown*.

19. For a comparison of the number of personnel utilized at Morgan and that utilized at a traditional elementary school of equivalent size, as well as a comparison of the costs of the magnet program, see Defendants' Exhibit No. 11. The curriculum at Morgan is basically the same as that taught at other elementary schools in the district; however, the manner of instruction is different. Full time science teachers are utilized at Morgan in place of general teaching, and consultants have been retained from the Clear Lake schools to assist students. To some extent, the curriculum differs as well. Morgan operates a unique and expanded kindergarten screening program utilizing additional personnel and diagnostic programs, and has an advanced music program which employs three full time teachers and piano instructors.

These programs, of course, have dual purposes: they provide quality education at Morgan, but in so doing, they are intended to encourage transfers of white and Hispanic students into Morgan. A bilingual education program has been implemented at Morgan, which has as one of its goals the attraction of Hispanic transfers.

■ Nevertheless, the key to eradicating the last vestiges of discrimination at Morgan "root and branch" remains the elimination of the substantially disproportionate racial composition that pervaded the Washington-Goliad-Carver schools, and the injurious effects of past discrimination that the opening of Morgan, despite improvements in facilities and faculty, threatened to perpetuate. In this regard, the defendants can justifiably point to the measured success of the magnet plan. Whereas Goliad and Carver as late as 1975 were greater than 90% black at a time when the district-wide elementary school population was 41% black, Morgan presently is 63% black as opposed to a district-wide population that is 43%.[20]

The defendants' efforts are commendable; vestiges of the dual system, once substantial, have become attenuated. Sufficient attenuation has not occurred, however, to enable this Court to find that the defendants have fulfilled the constitutional mandate to eliminate from Morgan all vestiges of state imposed segregation. It is the duty of this Court to ensure that the constitutional violation it has found is fully remedied, and until redress is complete, and the Court can say with measured assurance that GISD has achieved unitary status, Morgan must continue to operate under court scrutiny.

### IV.

■ The Court believes, however, that defendants are complying with the affirmative duty imposed by *Brown v. Board of Education* and its progeny, and that the magnet plan as presently implemented is constitutionally acceptable. In order to enable it to fashion whatever relief was indicated on the basis of the evidence adduced at the hearing on defendants' motion, the Court directed defendants to submit alternative desegregation plans for its consideration, and invited similar submissions from plaintiffs and amicus. *See Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). Plaintiffs and amicus did not respond to the Court's invitation; however, the defendants have reluctantly submitted four alternative proposals.[21] To varying degrees, all four call for the non-contiguous busing of students to and from the Morgan and Parker attendance zones.

Plans A and B, which call for the pairing of grades 2–5 at Morgan and Parker, are in essence variations on the "Vollert" theme. The evidence conclusively establishes, however, that these plans, like their precursor, will not substantially reduce the black population at Morgan, if at all, beyond the reduction realized under the magnet plan operating at its current level of effectiveness. Plan C calls for the non-contiguous pairing of all grades (K–5) at Morgan and Parker. Assuming full participation by affected parents and students,[22] the inclusion of the kindergarten and first grade children

Finally, beginning with this last semester, the defendants have implemented an after-school program at Morgan, intended to attract both white and Hispanic transfers to Morgan and black transfers to Parker. The after-school program is open only to these students, and thus encourages working parents to avail themselves of the defendants' majority-to-minority transfer program. It is as yet too early to assess the effectiveness of this new program, but the Court notes that it is practically sound.

**20.** *See* Defendants' Exhibit Nos. 1, 3–12.

**21.** A skeletal outline of these plans were attached to the defendants' pretrial order, and are reproduced herein in the Appendix to this opinion. The defendants do not urge the adoption of any of these plans, but remain dedicated to the neighborhood school policy and opposed to any compulsory pairing and

busing. The plans have been developed and submitted by defendants only upon the Court's directive.

**22.** Clearly, Judge Cowan was concerned that implementation of any plan requiring pairing and associated busing would lead to the exodus of white students from GISD. *Smiley v. Vollert, supra*, at 470. While defendants have adduced no concrete evidence that implementation of such a plan would create any substantial degree of "white flight," this Court is in agreement with its predecessor that "refusal to face this possibility would be blindness." *Id.* So too, it would seem, are a growing number of Justices of the United States Supreme Court. Dissenting from the dismissal of certiorari in *Estes v. Metropolitan Branches of Dallas NAACP, supra*, Justice Powell, joined by Justices Stewart and Rehnquist, has eloquently

in this pairing plan promises a substantial reduction in the percentage of black students at Morgan, as compared to the present effectiveness of the magnet plan. Indeed, of the various proposals before this Court, only Plan C could reasonably be expected to achieve the racial percentages set by Judge Cowan in the June 16, 1978 order. Plan D, denominated a "zone change," is—like the several pairing proposals—in reality a busing plan. Rather than pairing and busing entire grades at the two schools, Plan D will rezone a select group of students from the school they now reside closest to and, of necessity, bus them to the more distant school. The students affected by this plan, like those in Plan C, will come from every grade (K–5), and, again assuming full participation, some reduction in the black population at Morgan over that presently realized is possible.

Of all the proposals under consideration by this Court, Plan C is clearly the one that, if immediately implemented, will apparently "achieve the greatest possible degree of actual desegregation." *Davis v. Board of School Comm'rs, supra,* 402 U.S. at 37, 91 S.Ct. at 1292. Unfortunately, it is also the plan which will require the forced busing of the greatest number of elementary age children, some 800 scholastics, and it is a plan which will require the transportation of kindergarten and first grade children the greatest distance from their neighborhoods.

The implementation of Plan C is within the capacity of the defendants; indeed, while increased fiscal expenditures are unavoidable, no showing has been made that the cost of administering this plan would impose an intolerable burden on the District.[23] Defendants' position, however, and the position of the various educators who have given testimony on the defendants' behalf, is that the forced transportation of so many elementary age children would significantly impinge on the educational progress. Particularly with respect to Plan C, the defendants argue that equity should not compel the transportation of children of a particularly tender age, such as kindergarteners, from their familiar and identifiable neighborhood environs.

■ The defendants' position with respect to kindergarten children, at least, finds ample support in the decisions of the Fifth Circuit. The scope of permissible transportation of students as an implement of a remedial decree has never been defined with exactitude, and by its very nature cannot be delineated with precision. Objections to court-ordered transportation may have validity when the time or distance of travel is so great as to risk either the health of the children or significantly impinge on the educational process. In determining

---

argued that the time is long overdue for a re-examination of this consideration:

> [I]t is increasingly evident that use of the busing remedy to achieve racial balance can conflict with the goals of equal educational opportunity and quality schools. In all too many cities, well-intentioned court decrees have had the primary effect of stimulating resegregation.

444 U.S. at 438–39, 100 S.Ct. at 716–17. Because the measure of any desegregation plan is its effectiveness, it is incumbent upon federal courts to consider with care the impact a remedy is likely to have upon resegregation. Thus, Justice Powell forcefully observes that a desegregation remedy that does not take account of the social and educational consequences of extensive student transportation can be neither fair nor effective, *id.* at 451, 100 S.Ct. at 723:

> The pursuit of racial balance at any cost—the unintended legacy of Green—is without constitutional or social justification. Out of zeal to remedy one evil, courts may encour-

age or set the stage for other evils. By acting against one-race schools, courts may produce one-race school systems. Parents with school-age children are highly motivated to seek access to schools perceived to afford quality education. A desegregation plan without community support, typically one with objectionable transportation requirements and continuing judicial oversight, accelerates the exodus to the suburbs of families able to move. The children of families remaining in the area affected by the court's decree are denied the opportunity to be part of an ethnically diverse student body.

*Id.* at 450, 100 S.Ct. at 723.

23. Indeed, since pursuant to this plan the magnet program at Morgan would be dismantled, funds presently expended in that effort could be channeled into the increased transportation costs of Plan C. *See* Defendants' Exhibit No. 11.

the nature and extent of transportation that may be required in a given case, a district court must weigh the competing values involved and seek an equitable reconciliation of them. Limitations on the time of travel will vary with a multitude of factors, but it scarcely bears reiteration that the most significant of these factors is the age of the students involved. *Swann, supra*, 402 U.S. at 31, 91 S.Ct. at 1283.

▮ With respect to kindergarten children, the Fifth Circuit has in effect crystallized the balancing test enunciated in *Swann*, uniformly holding that the exclusion of kindergarten children from desegregation plans is constitutionally permissible, and permitting these children to attend neighborhood schools. *See, e. g., Pitts v. Cherry*, 598 F.2d 1005, 1007 (5th Cir. 1979); *Tasby v. Estes*, 572 F.2d 1010, 1014 (5th Cir. 1978), *cert. dismissed*, 444 U.S. 437, 100 S.Ct. 716, 62 L.Ed.2d 626 (1980); *Flax v. Potts*, 464 F.2d 865, 869 (5th Cir.), *cert. denied*, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972). The appellate court rule, fashioned in light of "the tender age and special needs" of kindergarten children, *Flax v. Potts, supra*, is salutary, and in this instance compelling. On this basis alone, this Court must reject Plan C as a feasible remedy in view of the circumstances.

Even in the absence of appellate guidance, however, this Court would disapprove of the plan as an equitable remedy. As the Supreme Court cautioned in *Swann*, "it must be recognized that there are limits" beyond which a court may not go in seeking to dismantle a dual school system. 402 U.S. at 28, 91 S.Ct. at 1282. It is now clear that a district court oversteps the bounds of its equitable authority when it requires implementation of a plan which goes beyond that

necessary to redress the incremental effects of a past violation. *Dayton Board of Education v. Brinkman, supra*. "A remedy simply is not equitable if it is disproportionate to the wrong." *Austin ISD v. United States, supra*, 429 U.S. at 995, 97 S.Ct. at 519.

▮ Given the limited nature of the constitutional violation in this case and its proven incremental effects, this Court could not sanction the implementation of Plan C without implicitly adopting a view of the defendants' constitutional obligations far exceeding anything heretofore required by the federal courts. While the watchword of any desegregation plan remains its effectiveness, *see Davis v. Board of School Comm'rs*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971), and while district courts and school authorities should make every effort to achieve the greatest possible degree of desegregation, *Swann, supra*, 402 U.S. at 26, 91 S.Ct. at 1281, a plan's effectiveness is not simply a measure of the degree of racial balance obtainable. The Court must balance the individual interest with the collective interest, *Milliken v. Bradley, supra*, 418 U.S. at 738, 94 S.Ct. at 3124,[24] and must take all reasonable steps to minimize avoidable abrasions and dislocations, *Lemon v. Bossier Parish School Board*, 566 F.2d 985, 989 (5th Cir. 1978). In the final analysis, the Court's vision must be both retrospective and prospective; that is, the Court should favor a plan which, in addition to providing immediate relief from incremental effects of past discrimination, will effect the maximum degree of *stable* desegregation practicable. *Lee v. Macon County Board of Education, supra* at 809. Plan C is not such a plan.

---

24. *See Austin ISD v. United States, supra*, 429 U.S. at 995 n.7, 97 S.Ct. at 519 n.7 (Powell, J., concurring):

A related equitable principle, also applicable in fashioning a desegregation remedy, is that a court has the duty to "balanc[e] ... the individual and collective interests." *Milliken v. Bradley*, 418 U.S. at 738 [94 S.Ct. at 3124]. The individual interests at issue here are as personal and important as any in our society. They relate to the family, and to the concern of parents for the welfare and education of their children—especially those of tender age. Families share these interests wholly without regard to race, ethnic origin, or economic status. It also is to be remembered, in granting equitable relief, that a desegregation decree is unique in that its burden falls not upon the officials or private interests responsible for the offending action, but, rather, upon innocent children and parents.

■ For similar reasons, the Court rejects Plan D as inequitable. The equitable principles which inform judicial efforts in this area require all reasonable attempts to be made to equalize the burdens and inconveniences of integration among various segments of the population, *Higgins v. Board of Education of Grand Rapids*, 508 F.2d 779, 794 (6th Cir. 1974), and certainly do not support imposition of such burdens predominantly on students of any race residing in select neighborhoods. *See United States v. Columbus Municipal Separate School District, supra,* at 232. This is particularly so where, as here, the plan of necessity calls for the creation of impractical attendance zones and the forced busing of kindergarten children from their neighborhood schools. *See Bradley v. Board of Public Instruction of Pinellas County*, 431 F.2d 1377, 1381 (5th Cir. 1970), *cert. denied*, 402 U.S. 943, 91 S.Ct. 1608, 29 L.Ed.2d 111 (1971).

Thus, of the alternative plans presented for this Court's consideration, only Plans A and B constitute appropriate equitable remedies for the violation found. When the effectiveness of the defendants' present plan is assessed in light of the facts at hand and in light of these alternatives, *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), there can be little doubt that the plan as presently administered is providing effective relief, and that defendants are complying with their constitutional obligation to eliminate all vestiges of past discrimination at Morgan "root and branch." There is ample evidence in the record to support the finding that the alternative plans the Court is empowered to implement are feasible and promising in their effectiveness, and indeed, based on this Court's review of prior orders and hearings in this case, it appears that this finding has already received judicial recognition. This Court finds that implementation of either Plan A or B would redress the incremental segregative effects at Morgan, and the very force of this conclusion makes clear that the present plan is an acceptable remedy so long as it proves equally effective as a desegregation measure.

In many respects, the considerations which prompted Judge Cowan to give the Court's tentative approval to the magnet plan now suggest that it is the best alternative available to this Court. Through the diligent efforts of the defendants, the plan has proven to be equally as effective as the Vollert Plan in achieving actual desegregation at Morgan, and has accomplished this desegregation with a minimum of abrasion and dislocation. But the factor which undoubtedly weighed most strongly in favor of the initial implementation of the plan is the same factor which now most forcefully supports its continued existence. This Court is as equally persuaded as its predecessor that the best chance of achieving a permanent solution at Morgan, *i. e.*, realizing the maximum degree of stable desegregation, is through the magnet school approach. Moreover, the magnet approach retains the potential for achieving a greater degree of actual desegregation than is possible under the alternative pairing proposals, whose effectiveness is inherently limited by the racial composition of the paired schools.

## V.

This Court has indicated that the constitutional violation in this case will not support several proposed desegregation plans which would, if implemented today, in all probability achieve a greater degree of integration at Morgan than that presently enjoyed. This should in no way be construed as an indication on the part of this Court that the violation found is insignificant. The constitutional right at stake here defies belittlement, and the paramount obligation of this Court is to "see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race," *Swann, supra,* 402 U.S. at 23, 91 S.Ct. at 1279, and to ensure that vestiges of past exclusions are expunged and equal educational opportunities made available to all. As Justice Brennan observed in his concurring opinion in *Dayton Board of Education v. Brinkman, supra,* 433 U.S. at 423–24, 97 S.Ct. at 2777:

[A] judicial decree to accomplish this result must be formulated with great sensitivity to the practicalities of the situation, without ever losing sight of the paramount importance of the constitutional rights being enforced. The District Court must be mindful not only of its "authority to grant appropriate relief," *ante*, at 410 [97 S.Ct. at 2770], but also of its duty to remedy fully those constitutional violations it finds. It should be flexible but unflinching in its use of its equitable powers, always conscious that it is the rights of individual schoolchildren that are at stake, and that it is the constitutional right to equal treatment for all races that is being protected.

We are concerned here, of course, with the elimination of the effects of discrimination inherent in a dual school system, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. Yet, because the magnet school approach is a purely voluntary desegregation plan, its success or failure is inextricably bound up with the attitudes and aspirations of the individuals comprising the local community.[25] Without continued aggressive and enthusiastic implementation by defendants ensuring participation by a broad cross-section of the community, the magnet approach will surely fail. Should the magnet approach wane in its effectiveness as a vehicle for the dismantling of the dual school system and establishment of a unitary system, it may become instead a vehicle which perpetuates the vestiges of past discrimination. There will be no equivocation by the Court should this situation come to pass, for the responsibility of the Court in such case is clear. The Court has found either of two alternative plans submitted to be feasible and workable, and the Court will not hesitate to order their immediate implementation to assure compliance with the mandate of *Brown v. Board of Education.*

Nor need this Court fear that its consideration of a back-up plan will prove a "self-fulfilling prophesy." The future of Galveston Independent School District is clearly ordained, not by fate, but by the Constitution of the United States. It is a future in which no child in this community shall be deprived of an education on account of race, or for that reason be made to wear the badge of inferiority so often worn in the past. For the defendants in this action, however, the future is now, and for now the defendants are complying with their constitutional duty. At some point, assuming continued compliance, defendants should have achieved full compliance with *Brown*. GISD will then be "unitary" in the sense required. Until then, this Court retains jurisdiction to assure that these responsibilities are carried out.

One final matter awaits the Court's disposition. In seeking modification of the Court's order of June 16, 1978, the defendants would have this Court decree that the magnet plan need only obtain a student population at Morgan 66% black to be constitutionally acceptable. The Court declines to grant defendants this relief. Insofar as possible, the extent of integration required of the plan is that which would have existed had defendants fulfilled their constitutional obligations in the past. In a system whose student population is 43% black, the defendants have failed to meet the burden of showing that in the absence of any constitutional violation two out of every three students attending Morgan would have been black.

Before the District can achieve unitary status, of course, it must alleviate any substantially disproportionate racial composition at Morgan. Thus, defendants legitimately point to the need for remedial criteria of sufficient specificity to assure compliance with this objective. *See Swann, supra*, 402 U.S. at 26, 91 S.Ct. at 1281. The Court believes, however, that what has been said

---

**25.** Of course, the success of any desegregation plan, voluntary or compulsory, ultimately depends upon the involvement of the local community. A voluntary plan is more dependent upon community involvement, however, because the bedrock of the plan is affirmative rather than passive participation by the local citizenry.

in this opinion provides defendants with sufficient guidance.

What is required of the defendants is a plan which realistically promises to work and promises to work now. The single most important criteria for assessing the merits of a plan is its effectiveness:

> The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system "at the earliest practicable date," then the plan may be said to provide effective relief. Of course, the availability to the board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method.

**26.** Operating at optimal effectiveness, the implementation of plans such as Plans A and B would obtain a student population at Morgan approximately 58–63% black. In operation, of course, the magnet plan has proven that it has the *capacity* to be equally effective. *See* Defendants' Exhibit No. 12. Thus, given the present racial distribution of elementary students in GISD, the Court essentially is requiring the defendants to administer the present plan so as to ensure that the percentage of black students at Morgan is within 20 percentage points of the district-wide average. *See Adams v. Richardson*, 356 F.Supp. 92 (D.D.C.),

*Green v. County School Board, supra,* 391 U.S. at 439, 88 S.Ct. at 1694.

It should be evident, then, that to be constitutionally acceptable the defendants must continue to administer their desegregation plan so as to equal or exceed the effectiveness of alternative proposals which the Court, within the confines of its equitable power, may require. Otherwise, the defendants must bear the heavy, if not insurmountable, burden of demonstrating to this Court why it should not order the immediate implementation of an alternative plan whose effectiveness is beyond reproach.[26]

Having said this, however, the Court reiterates that the defendants' affirmative duty in this case extends well beyond efforts to achieve a minimally acceptable racial balance at Morgan. Whatever impact decisions such as *Dayton Board of Education v. Brinkman* may have had on the parameters of the equitable prerogatives of federal courts in fashioning remedies in school desegregation cases, there has been no retreat from the *Swann* mandate that defendants strive with the utmost good faith to achieve the greatest possible degree of actual desegregation practicable under their plan. 402 U.S. at 26, 91 S.Ct. at 1281. Any default in this constitutional duty would be tantamount to the deliberate perpetuation of an impermissible dual system, which would compound the constitutional injury and prompt this Court to reconsider the scope and nature of the remedial action required. *See Green v. County School Board, supra,* 391 U.S. at 438, 88 S.Ct. at 1694.[27]

*aff'd as modified,* 480 F.2d 1159 (D.C.Cir. 1973). The defendants' constitutional obligations, however, do not end here. Refer to text *infra.*

**27.** It should be readily apparent that any change in the nature of the constitutional violation here would require a re-evaluation of the necessary remedy. The Court cannot foreclose the possibility that remedies today rejected as inequitable in view of the present violation might be required were additional violations to occur.

The Court at this time has no reason to anticipate such a development. Defendants are clearly and unequivocally committed to the success of the magnet program, and have consistently evidenced the intention and firm determination to comply with the requirements of the law. This Court is confident that the long and sometimes tortured road toward the establishment of a unitary school system in Galveston Independent School District is nearing its conclusion, and that the day will not be long when this Court need no longer intrude itself into the educational affairs of this community. Before that day has come, however, all vestiges of discrimination must be eliminated root and branch from Morgan, and whether this be accomplished under the auspices of the defendants' plan or otherwise, this Court gives its assurances that it shall be done.

### ORDER

In accordance with the Court's Memorandum Opinion set forth above, it is

ORDERED, ADJUDGED and DECREED that the Court Order of June 16, 1978 is MODIFIED insofar as it purports to require achievement of any precise racial balance at Morgan Elementary School within a scheduled time table; and further

ORDERED that defendants continue to implement the present court approved desegregation plan consistent with this Court's order until such time as this Court may conduct a final hearing to determine whether the Galveston Independent School District has achieved unitary status and a final judgment issues in accordance with that finding, or until such time as the Court orders otherwise.

### APPENDIX

Assumptions:

1. Both schools have kindergarten and first grades composed of students from the respective attendance zones.

2. All second and third grade students from both zones will attend Parker.

3. All fourth and fifth grade students from both zones will attend Morgan.

4. No magnet program—140 transfers return to their home school (63 HA, 77 AA)

| | | K | 1 | 2 | 3 | 4 | 5 | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Morgan | AA | 4 | 4 | 0 | 0 | 94 | 109 | 211 | 28% |
| | NA | 122 | 122 | 0 | 0 | 115 | 122 | 481 | 63% |
| | HA | 5 | 5 | 0 | 0 | 29 | 33 | 72 | 9% |
| | | 131 | 131 | | | 238 | 264 | 764 | |

| | | K | 1 | 2 | 3 | 4 | 5 | Total | |
|---|---|---|---|---|---|---|---|---|---|
| Parker | AA | 108 | 108 | 122 | 100 | 0 | 0 | 438 | 55% |
| | NA | 17 | 17 | 120 | 94 | 0 | 0 | 248 | 31% |
| | HA | 16 | 16 | 39 | 34 | 0 | 0 | 105 | 13% |
| | | 141 | 141 | 281 | 228 | | | 791 | |

*NOTE*

1. 227 students now attending Morgan would be bussed to Parker.

2. 256 students now attending Parker would be bussed to Morgan.

Pairing Plans—Morgan and Parker

*PLAN B*

Assumptions:

1. Both schools have kindergarten and first grade composed of students from the respective attendance zones.

2. All second and third grade students from both zones will attend Morgan.

3. All fourth and fifth grade students from both zones will attend Parker.

4. Magnet program will cease. 140 students now on transfer will return to their home schools (63 HA, 77 AA).

|        |    | K   | 1   | 2   | 3   | 4   | 5   | Total |      |
|--------|----|-----|-----|-----|-----|-----|-----|-------|------|
| Morgan | AA | 4   | 4   | 122 | 100 | 0   | 0   | 230   | 30%  |
|        | NA | 122 | 122 | 120 | 94  | 0   | 0   | 458   | 59%  |
|        | HA | 5   | 5   | 39  | 34  | 0   | 0   | 83    | 11%  |
|        |    | 131 | 131 | 281 | 228 |     |     | 771   |      |

|        |    | K   | 1   | 2   | 3   | 4   | 5   | Total |      |
|--------|----|-----|-----|-----|-----|-----|-----|-------|------|
| Parker | AA | 108 | 108 | 0   | 0   | 94  | 109 | 419   | 53%  |
|        | NA | 17  | 17  | 0   | 0   | 115 | 122 | 271   | 35%  |
|        | HA | 16  | 16  | 0   | 0   | 29  | 33  | 94    | 12%  |
|        |    | 141 | 141 |     |     | 238 | 264 | 784   |      |

*NOTE*

1. 248 students now attending Morgan would be bussed to Parker.

2. 282 students now attending Parker would be bussed to Morgan.

Pairing Plans—Morgan and Parker

*PLAN C*

Assumptions:

1. All kindergarten, first, and second grade students will attend Morgan.

2. All third, fourth, and fifth grade students will attend Parker.

3. Magnet program will cease. 140 students now at Morgan on transfer will return to their home schools (63 HA, 77 AA).

|        |    | K   | 1   | 2   | Total |      |
|--------|----|-----|-----|-----|-------|------|
| Morgan | AA | 112 | 112 | 122 | 346   | 42%  |
|        | NA | 139 | 139 | 120 | 398   | 48%  |
|        | HA | 21  | 21  | 39  | 81    | 10%  |
|        |    | 272 | 272 | 281 | 825   |      |

|        |    | 3   | 4   | 5   | Total |      |
|--------|----|-----|-----|-----|-------|------|
| Parker | AA | 100 | 94  | 109 | 303   | 42%  |
|        | NA | 94  | 115 | 122 | 331   | 45%  |
|        | HA | 34  | 29  | 33  | 96    | 13%  |
|        |    | 228 | 238 | 264 | 730   |      |

*NOTE*

1. 345 students would be bussed from the Morgan zone to Parker.

2. 453 students would be bussed from the Parker zone to Morgan.

ZONE CHANGE

*PLAN D*

Assumptions:

1. 122 Negro students from Parkland Apartments would be zoned into Parker from Morgan

2. 50 Negro students from Palm Terrace would be zoned into Parker from Morgan

3. 183 AA, 19 MA, and 2 NA students (K–5) now living west of 85th street would be zoned into Morgan from Parker

4. 140 students now at Morgan on transfer would return to their home schools (63 HA, 77 AA)

5. Magnet program would be eliminated

ENROLLMENT PROJECTIONS FOR PLAN

|       | Morgan |      |       | Parker |      |
|-------|--------|------|-------|--------|------|
| AA    | 204    | 29%  | AA    | 425    | 52%  |
| NA    | 385    | 54%  | NA    | 289    | 35%  |
| HA    | 119    | 17%  | HA    | 99     | 12%  |
| TOTAL | 708    |      | TOTAL | 813    |      |

*NOTE*

1. 80 NA students living in units 2–23 of Cedar Terrace are now zoned into Parker.

2. 283 NA students would be moved if Plan C went into effect.

3. 254 AA students would be moved if Plan C went into effect.